[Sac. No. 6886.   In Bank.   Apr. 8, 1959.]

CITY OF LOS ANGELES et al., Appellants, v. COUNTY
OF MONO, Respondent.

844

Roger Arnebergh, City Attorney, Gilmore Tillman, Chief Assistant City Attorney for Water and Power, A. H. Driscoll, Assistant City Attorney, and O. M. Lloyd, Deputy City Attorney, for Appellants.

N. Edward Denton, District Attorney, Morris M. Doyle, John N. Hauser, McCutchen, Thomas, Matthews, Griffiths .& Greene, McCutchen, Doyle, Brown & Enersen and Verne Summers for Respondent.

THE COURT.—Plaintiffs (hereinafter referred to as the "city") brought two actions to recover taxes paid under protest to defendant (hereinafter referred to as the "county"). Before paying the taxes, the city made appropriate application to the State Board of Equalization for relief from the assessments, but the board denied any relief. One of the actions was to recover taxes paid on two hydroelectric generating plants and appurtenant works on the Owens River, a transmission line, and a dam on Rush Creek; the other to recover alleged excessive and discriminatory taxes on approximately 20,000 acres of land in Mono County. The actions were consolidated for trial, and a trial de novo was ordered as to several issues set out in pretrial orders. Judgment was rendered denying the city any relief. This appeal is from said judgment.

APPEAL RELATING TO HYDROELECTRIC PLANTS,
TRANSMISSION LINE AND DAM

In 1933 the city purchased two power plants located in the Owens River Gorge in Mono County. They were known as Adams Main and Adams Auxiliary and had a combined generating capacity of 7,400 kilowatts. The plants were "run of

the stream'' units and until the completion of the Long Valley Dam in 1940 could operate only during the part of the year when the natural flow of the Owens River provided sufficient water.

The Adams plants were located in the east half of section 16 and were taxable when acquired. The city owns all the land in the gorge, but all except the east half of section 16 was purchased from the federal government and was not taxable at the time of acquisition.

At the upstream end of the gorge the city constructed Long Valley Dam, which created a reservoir of some 183,465 acre-feet known as Crowley Lake. The reservoir provides regulation for the flow of the Owens River. The reservoir impounds not only the waters of the Owens River but also waters of a foreign watershed, Mono Basin, which are diverted from the natural watershed and conducted to Crowley Lake by a system of aqueducts and tunnels. The right to divert these waters had been acquired by the city prior to 1941. Through the addition of this foreign water supply, the average flow available into Crowley Lake was increased from 230 second-feet, the natural flow of the Owens River, to 405 second-feet.

In 1948 the city commenced construction of a three-plant hydroelectric generating system in the gorge. Two of these plants are located in Mono County, and the third is in Inyo County at the foot of the gorge. Each unit can generate 37,500 kilowatts of power. The trial court in its findings refers to these three plants and appurtenant works as the Gorge System.

After completion of the three new plants in the gorge, it was possible to operate the Adams plants only by diverting water from the new facilities, which were designed to utilize the entire flow of water available in the gorge. There were various methods whereby water could be diverted from the Gorge System to one or the other of the Adams plants, and vice versa. However, all these possibilities involved loss of water from the Gorge System and a consequent reduction of its efficiency. There was testimony to the effect that any loss of water from the Gorge System resulted in a substantial economic loss to the city.

The city had planned to abandon the Adams plants upon the completion of the new facilities. Steps were taken to put them out of service and retire them permanently. However, prior to the completion of this plan the city decided to return them to use. The trial court found that the rescission of the

retirement of the Adams plants was carried out by the city in an attempt to avoid taxation of the new facilities by the county, and not because the Adams plants had any actual or potential utility. The Adams plants were not operated after the completion of the new plants until the time of the commencement of this litigation, and were operated then only intermittently. Extensive repairs were required at that time to place them in operating condition. Expert witnesses testified that after the construction of the new facilities the Adams plants were without value as standby plants or for any other purpose. The county began to tax the new plants when they were completed.

The city purchased a dam on Grant Lake in 1934. The dam was subject to taxation at the time of acquisition. It impounded the waters of Rush Creek and created a reservoir with a capacity of 10,000 acre-feet. The reservoir had previously supplied water for irrigation. In 1941 the city constructed a new dam (New Grant Lake Dam) a short distance downstream from the old dam. The reservoir created by the new dam has a capacity of 47,500 acre-feet. When the new dam was completed, the old dam was breached and became submerged. The old dam was assessed and taxed until the 1954-1955 tax year. Thereafter the county taxed the new dam. The trial court found that the new dam replaced the old dam.

At the time the new plants were constructed the city also constructed a transmission line which connected the new plants to the Los Angeles system. The taxability of this line was not raised before the State Board of Equalization. In the trial court the city's complaint alleged that the line was tax exempt and that it was erroneously assessed and taxed. These allegations were denied by the county.

The pretrial orders limited the issues to be tried. Although the pretrial orders are somewhat generally stated, it is evident from discussions had during the trial that they were designed to limit the issues to whether the Gorge plants in Mono County and the New Grant Lake Dam were replacements or new improvements. The new transmission line was not to be in issue.

The taxation of municipally-owned property is governed by article XIII, section 1, of the California Constitution, which provides in part: ". . . property . . . such as may belong . . . to any . . . municipal corporation within this State shall be exempt from taxation, except such lands and the improvements thereon located outside of the . . . municipal

corporation owning the same as were subject to taxation at the time of the acquisition of the same by said . . . municipal corporation; provided, that no improvements of any character whatever constructed by any . . . municipal corporation shall be subject to taxation.''

Article XIII, section 1, formerly granted a blanket exemption to all municipal property, wherever located and whenever acquired. By 1914 Los Angeles and San Francisco had acquired extensive property holdings in the mountain counties of Mono, Inyo and Tuolumne. It became apparent that those counties faced an ever-increasing diminution of their tax base as the holdings of foreign municipalities increased. Therefore, in 1914, the constitutional provision was amended to read as quoted above. Protection of the tax position of those counties in which municipalities acquire property for the operation of various municipal projects has long been judicially recognized as the purpose of the amendment. (*City of Long Beach* v. *Board of Supervisors,* 50 Cal.2d 674, 677 [3] [328 P.2d 964]; *City of Pasadena* v. *County of Los Angeles,* 37 Cal.2d 129, 132 [2] [230 P.2d 801]; *City & County of San Francisco* v. *County of San Mateo,* 36 Cal.2d 196, 199 [222 P.2d 860]; *Rock Creek etc. Dist.* v. *County of Calaveras,* 29 Cal.2d 7, 9 [2] [172 P.2d 863]; *City & County of San Francisco* v. *County of San Mateo,* 17 Cal.2d 814, 818 [2] [112 P.2d 595]; *City & County of San Francisco* v. *County of Alameda,* 5 Cal. 2d 243, 245 [2] [54 P.2d 462]; *Pasadena* v. *County of Los Angeles,* 182 Cal. 171, 174 [187 P. 418].)

█ The permission to tax granted by article XIII, section 1, has been construed to include not only improvements subject to taxation when acquired but also replacements and substitutes for these improvements. (*City & County of San Francisco* v. *County of San Mateo, supra,* at 819.) In the event a replacement is made, it is taxed at its fair market value, and not that of the improvement that was replaced. (*City of Pasadena* v. *County of Los Angeles, supra,* at 134.) On the other hand, it is specifically stated in article XIII, section 1, that new improvements constructed after acquisition are not taxable.

The issue in this case, then, is clearly drawn: Are the Gorge System plants and the New Grant Lake Dam replacements for improvements subject to taxation when acquired by the city, or are they new improvements? We believe they are replacements and thus taxable by the county.

█ Looking first at the hydroelectric plants, it is readily

apparent that the Gorge System replaced the Adams plants. The Gorge System was designed to utilize the entire flow of available water. Testimony of expert witnesses demonstrated that any use of the Adams plants concurrently with the Gorge plants would substantially reduce the efficiency of the latter. There was also testimony to the effect that the Gorge System was designed to assume the functions of the Adams plants, and that the Gorge System plans called for the removal of the Adams plants from service. It is immaterial that the plans to retire the Adams plants were revoked, particularly in view of the trial court's finding that the revocation was accomplished for tax avoidance purposes.

Nor is it significant that the new facilities are much larger and more efficient and provide ten times as much power as the old plants. In *City & County of San Francisco* v. *County of San Mateo, supra,* 17 Cal.2d 814, the question was presented whether a concrete canal which replaced a wooden flume was taxable under article XIII, section 1. The concrete canal had a capacity four times as great as the flume. The court said at page 819: ''While the concrete canal in this case is of larger dimensions and has a greater capacity than the wooden flume, it is substantially the same improvement. It is used for the same purpose and is a part of the same water works system. Both are used as conduits for transporting water. It cannot fairly be said that the concrete canal is different in character from the wooden flume.'' And in *City of Pasadena* v. *County of Los Angeles, supra,* the water mains held taxable as replacements were ''larger and more substantially constructed, and of greater value than the improvements they replaced; and . . . were constructed to serve a different purpose in that they were larger and would serve more parts of the water system.'' (37 Cal.2d at 131.)

In this case the new facilities are substantially the same improvement as the Adams plants. The greater capacity, more elaborate and efficient operation, and greater value of the Gorge System do not serve to differentiate it in character from the Adams plants. Electric power is still generated, but on a much broader and more efficient scale.

The city places great reliance on the fact that the Adams plants are still in existence. It reasons that since they are still present in the gorge, they cannot have been replaced. The city defines ''replacement'' too narrowly.

''Replacement'' must be construed in such a way as to achieve a result consonant with the purposes of the amend-

ment of article XIII, section 1. The definition of "replacement" urged by the city would enable a foreign municipality to obtain the tax exemption that existed prior to the amendment of article XIII, section 1, by merely leaving a replaced improvement in existence after the construction of its successor. The replaced improvement would often be without value, and its successor, not being a "replacement," would be tax exempt. Thus no revenue would be produced by either, and the purposes of the amendment would be defeated.

In the case before us there can be little question that the Gorge System made the Adams plants valueless. Under normal conditions, the former utilizes the entire flow of water, making the latter inoperable. It was shown that the Adams plants had little or no value as standby facilities. It took too long to place them in operating condition, and even when operative, the 7,400 kilowatts that could be generated would not be a worthwhile standby supply of power for the 112,500 kilowatts that the Gorge System could generate or even the 37,500 kilowatts generated by a single unit.

Moreover, the impracticability of requiring physical removal is obvious. In many situations, as in the present case, salvaging the property would cost more than abandonment. We do not wish to encourage such waste.

It appears that the New Grant Lake Dam is also a replacement. After the new dam was completed, the old dam was breached and is now submerged. The new dam has assumed the functions of the old dam,—impounding the waters of Grant Lake and its tributaries. The new dam is higher and impounds considerably more water, but, as indicated by the San Mateo canal case and the Pasadena water main case, identity is not required.

That the purpose of the amendment would be defeated if we adopted the city's contention that physical removal of the old improvement is required before its successor can be a "replacement" is clearly demonstrated here. The old dam has absolutely no value. However, since it is still in existence, although submerged, the new dam, under the city's definition, could not be a "replacement." The loss of revenue is apparent.

*City & County of San Francisco* v. *County of San Mateo, supra,* 36 Cal.2d 196, lends no support to the city's claim that the Gorge plants and the New Grant Lake Dam are tax exempt. That case was not a replacement case, although it recognized the rule subjecting replacements to taxation. Since

we have decided that the Gorge plants and the New Grant Lake Dam are replacements, that case is inapplicable.

### APPEAL RELATING TO ASSESSMENT OF CERTAIN LANDS OWNED BY THE CITY

The city owns approximately 62,000 acres of land in Mono County. This acreage was taxable when acquired and is taxable now. The city contends that the county placed excessive assessments on some 20,000 acres referred to as grazing land, and also overassessed the east half of section 16, which is the site of the Adams plants and the Middle Gorge Plant. This phase of the case, therefore, deals solely with a question of the valuation of admittedly taxable property.

■ Judicial review of the decisions of the State Board of Equalization is a limited one. The findings of the state board when it sits as a board of equalization pursuant to the Constitution have the same effect as findings of county boards of supervisors sitting as boards of equalization. (*Covert* v. *State Board of Equalization*, 29 Cal.2d 125, 131 [173 P.2d 545]; *Alpaugh Irr. Dist.* v. *County of Kern*, 113 Cal.App.2d 286, 290 [248 P.2d 117].)

■ The effect to be given the decision of a county board of equalization has been stated to be as follows: "The duty of determining the value of the property and the fairness of the assessment is confided to the appropriate county board of equalization. Furthermore, in discharging this duty, the board's determination upon the merits of the controversy is conclusive; the taxpayer has no right to a trial de novo in the superior court to resolve conflicting issues of fact as to the taxable value of his property. (Citations.) ■ The question presented to the superior court in such an action is whether there was evidence of sufficient substantiality before the board to justify the finding (citation), and in the absence of fraud or malicious or arbitrary use of its powers the board is the sole judge of questions of fact and of the values of property. (Citation.)" (*Bank of America* v. *Mundo*, 37 Cal. 2d 1, 5 [229 P.2d 345].)

■ It is therefore incumbent on the city in this proceeding to show that the State Board of Equalization acted fraudulently or maliciously or used its powers arbitrarily. For the reasons stated herein, we feel that the city has not sustained its burden.

The city introduced evidence tending to show that its land was assessed at a higher rate than other allegedly comparable

land in the county. This evidence consisted of a comparison of value determined by the number of cattle that could be grazed on the city's land and on comparable land. On the other hand, the county's witness, Mr. Ralph Goodall, testified that he had appraised the city's land and was of the opinion that the value placed thereon by the assessor represented the fair market value of the land as grazing land.

It appears that there was merely a conflict in the evidence, which was resolved by the board in the county's favor. The record amply supports the trial court's finding that the board's decisions as to the assessment on the city's land were supported by substantial evidence and did not constitute an abuse of discretion. The board's decisions as to the assessment on the east half of section 16 is equally well supported. It is sufficient to cite only the evidence that the parcel has a unique value as a power site due to the great drop of water in a relatively short distance.

The city has endeavored to discredit the county's witness, Mr. Brothers, because he considered prior sales of the property. However, it is clear from his testimony that these sales were among several factors considered by him. Moreover, it is well established that prior sales may be used as a starting point in appraising property. (*Rancho Santa Margarita* v. *San Diego County*, 135 Cal.App. 134, 141 [26 P.2d 716].)

The judgment is affirmed.

Appellants' petition for a rehearing was denied May 6, 1959, and the opinion was modified to read as printed above.