[Civ. No. 10985. Third Dist. Feb. 16, 1966.]

COUNTY OF AMADOR et al., Plaintiffs and Appellants, v. STATE BOARD OF EQUALIZATION et al., Defendants and Respondents; EAST BAY MUNICIPAL UTILITY DISTRICT, Real Party in Interest and Respondent.

James E. Deasy and George A. Huberty, County Counsel, for Plaintiffs and Appellants.

Thomas C. Lynch, Attorney General, Dan Kaufmann and Ernest P. Goodman, Assistant Attorneys General, and Edward P. Hollingshead, Deputy Attorney General, for Defendants and Respondents.

Harold Raines, John B. Reilley and Frank E. Howard for Real Party in Interest and Respondent.

FRIEDMAN, J.—The tax assessors of Amador and Calaveras Counties fixed the assessed value of water rights held by East Bay Municipal Utility District at Pardee Dam. The dam is located on the Mokelumne River, which forms the boundary between the two counties. The counties placed an aggregate assessed value of $8,342,000 on these rights, each entering one-half that amount on its assessment roll for 1961-62. Dissatisfied with these assessments, the utility district

invoked the State Board of Equalization's constitutional power of "review, equalization and adjustment" of assessments on publicly owned property under article XIII, section 1, of the state Constitution.[1] After hearings the Board of Equalization ordered reduction of Amador County's assessments to $275,000 and Calaveras' to $300,000. The two counties then filed mandate proceedings against the board, seeking judicial review under Code of Civil Procedure section 1094.5. By stipulation, the Calaveras action was transferred to Amador County and both cases were heard together. The counties appeal from adverse judgments.

East Bay Municipal Utility District is concededly a "municipal corporation" for the purpose of article XIII, section 1. (*Rock Creek Water Dist.* v. *County of Calaveras*, 29 Cal.2d 7 [172 P.2d 863].) Thus the district is subject to county taxes on land outside its own boundaries if the land was subject to taxation at the time the district acquired it. Water rights, whether appropriative or riparian, are regarded as "land" for this purpose. (*City & County of San Francisco* v. *County of Alameda*, 5 Cal.2d 243 [54 P.2d 462] ; *County of Tuolumne* v. *State Board of Equalization*, 206 Cal.App.2d 352, 358 [24 Cal.Rptr. 113] ; see Herlick, *Water Rights Taxation*, 3 Santa Clara Lawyer 153-163.) Assessments on publicly owned property under article XIII, section 1, are subject to "review, equalization and adjustment" by the State Board of Equalization. The parties do not dispute the taxing agencies' resort to mandate proceedings as a means of judicial review of the board's action. (See *County of Tuolumne* v. *State Board of Equalization, supra,* 206 Cal. App.2d at pp. 373-374.)

The history of the Mokelumne River water rights held by East Bay Municipal Utility District is briefly stated: Com-

---

[1]Article XIII, section 1, provides in part: ". . . property . . . such as may belong to this State, or to any county, city and county, or municipal corporation within this State shall be exempt from taxation, except such lands and the improvements thereon located outside of the county, city and county or municipal corporation owning the same as were subject to taxation at the time of the acquisition of the same by said county, city and county, or municipal corporation; *provided,* that no improvements of any character whatever constructed by any county, city and county or municipal corporations shall be subject to taxation. All lands or improvements thereon, belonging to any county, city and county or municipal corporation, not exempt from taxation, shall be assessed by the assessor of the county, city and county or municipal corporation in which said lands or improvements are located, and said assessment shall be subject to review, equalization and adjustment by the State Board of Equalization. . . ." (See also Rev. & Tax Code, § 1822, quoted fn. 3, *infra.*)

mencing in 1924 the district filed several applications with the State Division of Water Rights under the Water Commission Act (now Wat. Code, § 1000 et seq.), seeking permits to divert and store Mokelumne River water for the proposed water supply and hydroelectric project now known as Pardee Dam and Reservoir. The district's applications for appropriative water had been preceded by competing applications of private persons. One series had been filed in 1919 and 1920 by the J. W. Preston group. Another series had been filed by Stephen E. Kieffer in 1921 and 1923. Hearings on these applications were held during 1925. As a municipal water supplier the district enjoyed a statutory preference without regard to time priorities. (See Wat. Code, § 1460.) During 1926 and thereafter the Division of Water Resources issued a group of three permits in response to the applications of the utility district. Action on the competing applications of the Preston group and Kieffer was deferred and no permits were ever issued to these applicants. The district proceeded to acquire the reservoir site and to construct its project. Pardee Dam and Reservoir, with their related diversion, power production and distribution facilities, have been in operation since 1929.

These appropriative rights were subordinate to certain preexisting, downstream riparian rights. One Lloyd Thayer had acquired 207 acres of land with accompanying riparian rights below the site of the project dam. Thayer organized the Colorado Power Company, which in 1929 conveyed the land and riparian rights to the City of Lodi for the limited purpose of establishing a hydroelectric project. In order to make full use of its state-granted appropriative rights and to free it from potential lawsuits, East Bay Municipal Utility District had to acquire superseding interests in the downstream riparian rights of the City of Lodi and Colorado Power Company. This acquisition was accomplished by a condemnation action, which culminated in this court's decision of February 1932 in *East Bay Mun. Util. Dist.* v. *City of Lodi,* 120 Cal.App. 740 [8 P.2d 532].

The counties charge the State Board of Equalization with several errors of law and one error of valuation, contending: (1) That the Board of Equalization had no power to classify the state-issued appropriative rights as exempt and no power to eliminate them from the assessment. (2) In any event the board erred in so classifying these rights. (3) The board

acted arbitrarily and without substantial evidence in reducing the counties' valuation of the downstream riparian rights to $275,000 and $300,000, respectively. (4) The board erred when it applied the ''intercounty equalization ratio'' to establish the assessed value of the downstream rights. (5) The Board of Equalization erred in failing to make findings of fact.

### Appropriative Water Rights
### Held Under Direct State Permits

The counties' jurisdictional attack is aimed at a closed question. ■ When taxable and nontaxable interests of a public agency are included in a single assessment figure, segregation between exempt and nonexempt values is part of the Board of Equalization's constitutional function of assessment ''adjustment.'' Such was the holding in *City & County of San Francisco* v. *County of San Mateo*, 36 Cal.2d 196, 201 [222 P.2d 860].

The counties attempt to distinguish *City & County of San Francisco* v. *County of San Mateo*, suggesting that the segregation there was one between land and improvements, rather than a separation between taxable and exempt interests. The suggestion is negated by the following statement in the opinion in that case: ''An adjustment is sought by virtue of an erroneous inclusion of exempt improvements with taxable lands. . . . We therefore have a problem of 'equalization and adjustment' confided by the Constitution to the State Board of Equalization. It is the province of the board to 'adjust' the assessment so that the exempt and the nonexempt portions of the property be properly segregated.'' (*City & County of San Francisco* v. *County of San Mateo*, *supra*, 36 Cal.2d at p. 201.) ■ In view of this rule, the State Board of Equalization had authority to delete any tax-exempt values included in the present assessments. We turn to the substantive question of exemption.

Two pertinent points were established by *County of Tuolumne* v. *State Board of Equalization*, *supra*, 206 Cal.App. 2d 352. ■ First, state-granted appropriative water rights in the hands of the taxpaying public entity are exempted by article XIII, section 1, when these rights are based upon applications filed by the public entity itself or its representatives. (206 Cal.App.2d at pp. 357-360.) ■ Second, when these state-issued rights emanate from filings purchased by the public entity from private individuals, they fall within

the constitutional description of "lands . . . subject to taxation at the time of [their] acquisition" by the public taxpayer, hence are taxable. The latter holding was based upon the concept of a taxable possessory right in the hands of the private filer, even though he had not actually received an appropriative permit or completed his diversion facilities. (206 Cal.App.2d at pp. 361-364.) No Supreme Court hearing was sought in the *Tuolumne* case. We concur with the *Tuolumne* decision.

The counties contend that East Bay's appropriative rights are more comparable to those held taxable in the *Tuolumne* case than to those exempted. Here—so runs the argument—East Bay's own appropriative filings had been preceded by the competing applications of private persons; the latter, upon filing, had acquired taxable possessory interests; when the state rejected the applications of the private persons and granted those of the utility district, the latter succeeded to the private filers' property interests; these had been taxable at the time of their acquisition, hence are taxable in the district's hands. The counties invoke by analogy the "replacement" principle applicable to the taxation of publicly owned physical improvements.

Article XIII, section 1, has been construed to permit taxation not only of physical improvements in existence at the time the public entity acquired ownership, but also replacements and substitutes for those improvements. (*City of Los Angeles* v. *County of Mono,* 51 Cal.2d 843, 848 [337 P.2d 465]; *City & County of San Francisco* v. *County of San Mateo,* 17 Cal.2d 814, 819 [112 P.2d 595].) The taxpayer's unilateral replacement of one physical asset by another bears no analogy to the successive and utterly distinct interests of competing applicants for state-granted water rights. There is no identity nor even privity between the holders of these successive rights. The replacement doctrine prevents the public taxpayer from avoiding taxation by constructing exempt improvements to replace taxable improvements. This policy objective is usually irrelevant where the municipal entity seeks original appropriative water rights in competition with the private filer and indeed utilizes its statutory preference to nullify the latter's time priority.

The possessory interests of the private filers and the appropriative rights issued to East Bay had separate identity, separate origin and separate characteristics. In no sense

were the former embryonic precursors of the latter. The private filers' interests had a temporary and conditional character, existing only until the creation of an appropriative right. (Wat. Code, § 1450; *Yuba River Power Co. v. Nevada Irr. Dist.*, 207 Cal. 521, 527-538 [279 P. 128]; *Miller & Lux, Inc. v. Bank of America*, 212 Cal.App.2d 719, 726 [28 Cal.Rptr. 401]; see also *East Bay Mun. Util. Dist. v. Department of Public Works*, 1 Cal.2d 476, 480-481 [35 P.2d 1027].) Until East Bay's appropriative rights were created by permit, the water remained unappropriated. (Wat. Code, §§ 1202, 1253, 1375.) Only upon issue of permits did the appropriative rights come into existence. The latter conferred permanent use and storage rights, subject only to divestiture by the state for failure to comply with conditions of law or of the permits. (Wat. Code, §§ 1390, 1391, 1410-1415.) These were new and original rights acquired from the state, not a transmutation of the virtually rejected private filings. (*County of Tuolumne v. State Board of Equalization, supra*, 206 Cal.App.2d at p. 359; *United States v. Fallbrook Public Util. Dist.*, 165 F.Supp. 806, 856.) The utility district had no *predecessor* in whose hands these rights constituted a taxable asset. If East Bay succeeded to anything, it was the inchoate (but tax-exempt) rights created by its own applications. The district's new and original appropriative rights were not subject to taxation at the time of their acquisition, thus are constitutionally exempt from taxation in the district's hands.

The counties argue that the exemption violates the objective of article XIII, section 1. As pointed out by Justice Stone in the *Tuolumne* case (206 Cal.App.2d at pp. 364-365), the constitutional provision seeks to safeguard the tax revenues of small counties by preventing removal of taxable property from their tax rolls. (See also *Rock Creek Wat. Dist. v. County of Calaveras, supra*, 29 Cal.2d at p. 9; *City & County of San Francisco v. County of Alameda, supra*, 5 Cal.2d at pp. 245-246.) It does not impose taxation on the water rights created by East Bay's appropriative permits, which were never taxable and never on the counties' tax rolls. In our view the trial court correctly sustained the exemption decision of the State Board of Equalization.

*Downstream Riparian Rights*
*Acquired by Condemnation*

The downstream riparian rights acquired by condemnation are concededly taxable. At this point the question is

one of valuation. The original assessment of $8,342,000 fixed by the two county assessors and split between their tax rolls assumed complete taxability and did not segregate exempt from taxable values. The Board of Equalization simply reduced the counties' assessments to $275,000 and $300,000, respectively, without any other discernible findings applicable to the taxable rights. The board's administrative decision and findings relative to the Amador County valuation are expressed in this single sentence: "You are hereby further notified that said Board has ordered that the 1961 assessment roll of Amador County be adjusted so as to eliminate from said assessment the values for said exempt water rights and that said assessment of the water rights at Pardee Dam be reduced to $275,000 assessed value." Except for the substitution of the county's name and the $300,000 assessment figure, the *Calaveras* decision is stated in identical terms.

A brief description of the taxable property interests will aid in an understanding of the valuation problem. The opinion in *East Bay Mun. Util. Dist.* v. *City of Lodi, supra,* 120 Cal.App. 740, points out that Thayer's 207 acres were rocky and unfit for agriculture; that neither Thayer's firm nor the City of Lodi had ever made beneficial use of the Mokelumne River flow; that, under varying circumstances, Thayer's land was suitable for a power project with a head of water between 43 and 57 feet. (120 Cal.App. at p. 743.) The final decree of condemnation did not transfer these riparian rights *in toto* to East Bay. Rather, it awarded the district an easement subordinating the Lodi-Colorado Power Company rights to the utility district's rights to divert up to 310 cubic feet per second at Pardee Dam for domestic and municipal water supply and to divert for hydroelectric purposes and return to the river at the base of the dam "up to" 750 cubic feet per second. For this easement the condemnation decree awarded the defendants $25,000.

The counties contend that the apparent market value and assessed value of taxable rights as found by the board are arbitrary and without substantial evidentiary support. At the hearings the counties' expert witness, Mr. C. O. Henning, gave the district's water rights at Pardee Dam a market value of approximately $33,000,000. Mr. Jack Parle, an appraiser for the Board of Equalization, expressed a market value opinion of $25,000,000. Mr. Henning calculated that

reasonable beneficial use under the City of Lodi-Colorado Power rights would have permitted diversion of the natural stream flow above 100 cubic feet per second up to a maximum of 1,200 cubic feet per second.[2] Mr. Henning translated the 1,200 cubic foot entitlement into storage rights amounting to 92,043 acre feet per annum, all emanating from the Lodi-Colorado Power acquisition. The latter figure amounts to 41 percent of the total storage for municipal and power uses at Pardee Dam. Application of the 41 percent figure to the market value of total storage would confer a market value of more than $13,000,000 on that capacity attributable to the downstream rights. The counties point out that the Board of Equalization apparently attributed to the downstream rights a value of 10 percent, rather than 41 percent, of Mr. Henning's total market value appraisal. They point out that Mr. Henning's testimony constituted the only evidence separately evaluating the downstream rights. Thus they contend that the board's market value figure has no support in the evidence.

The board's decisions supply no ground for assuming that the board accepted Mr. Henning's $33,000,000 market value estimate. The 41 percent formula proposed by the counties would attribute to the downstream rights a valuation much larger than they possess. The formula is inacceptable because it is based upon erroneous assumptions of law. The owners of the 207 acres had no riparian right to any fixed quantity of water, but only a right to reasonable beneficial use. (Cal. Const., art. XIV, § 3; *Seneca Consol. Gold Mines Co.* v. *Great Western Power Co.*, 209 Cal. 206, 220-221 [287 P. 93, 70 A.L.R. 210].) The condemnation "take" could not be expressed in terms of the gross water quantity conceivably usable by a project which never got off the drawing board. The condemnation defendants lost the difference, if any, by which the aggregate reasonable needs of downstream owners exceeded the quantity and rate of flow coming down the Mokelumne after Pardee Dam went into operation. East Bay gained only an easement, an immunity from interference which "firmed up" its appropriative right to divert and store water upstream. In terms of a market price between a willing seller and willing buyer (*DeLuz Homes, Inc.* v.

---

[2]So far as we can glean from the record, the sole foundation for the 1,200 cubic foot per second figure is the design capacity of a power project once conceived and designed (but never built) by the City of Lodi for installation and operation on the appurtenant 207 acres.

*County of San Diego*, 45 Cal.2d 546, 561-562 [290 P.2d 544]), the easement had no market value in isolation. It possessed value only because it added stability to the upstream appropriative rights. However difficult to calculate, its value consisted of such worth as it conferred on these appropriative rights.

More compelling is the counties' attack on the findings of the State Board of Equalization. ■ Findings on material issues delineate the basis for an administrative agency's decision. Inadequate findings impede the parties' recourse to the courts and thwart the latter in the performance of their review obligations. ''The more general the findings, the more difficult it is for the reviewing court to ascertain the principles relied upon by the reviewing agency.'' (*California Motor Transport Co.* v. *Public Util. Com.*, 59 Cal.2d 270, 274 [28 Cal.Rptr. 868, 379 P.2d 324].) ■ Aside from their aid to the litigants, findings are needed to aid the courts in determining whether there is sufficient evidence to support them and to enable the courts to determine whether the decision is based on lawful principles. (*Swars* v. *Council of City of Vallejo*, 33 Cal.2d 867, 871 [206 P.2d 355].) Insufficiency of the findings to permit fair review may entail a remand to the administrative agency. (*Temescal Water Co.* v. *Department of Public Works*, 44 Cal.2d 90, 102 [280 P.2d 1].)

■ In reviewing valuation decisions reached by the State Board of Equalization under article XIII, section 1, the courts have adopted the same criteria prevailing when actions of local boards of equalization are under judicial review. The board's valuation figure and the method of valuation employed by it are reviewable only for arbitrariness, abuse of discretion or failure to follow the standards prescribed by law. (*City of Los Angeles* v. *County of Mono, supra,* 51 Cal.2d at p. 851; *County of Tuolumne* v. *State Board of Equalization, supra,* 206 Cal.App.2d at p. 372.) However limited, judicial review extends to (a) the valuation figure found by the board of equalization and (b) its method of valuation. (*DeLuz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d at p. 564; *Utah Constr. Co.* v. *Richardson*, 187 Cal. 649, 655 [203 P. 401].) ■ If a board of equalization is called upon for a decision of law, the taxpayer has recourse to the courts for a determination of that question. (*Flying Tiger Line, Inc.* v. *County of Los Angeles,* 51 Cal.2d 314, 322 [333 P.2d 323].)

As has been frequently pointed out, full cash value or market value is the standard of valuation for property tax purposes. Standard California assessment practices conceive of assessed value as a percentage of market value. (See *Rittersbacher* v. *Board of Supervisors,* 220 Cal. 535, 543-544 [32 P.2d 135]; *Hanks* v. *State Board of Equalization,* 229 Cal. App.2d 427, 433-436 [40 Cal.Rptr. 478]; *Michels* v. *Watson,* 229 Cal.App.2d 404, 407 [40 Cal.Rptr. 464]; *A. F. Gilmore Co.* v. *County of Los Angeles,* 186 Cal.App.2d 471, 476 [9 Cal.Rptr. 67].) Generally, market value is estimated by one or a combination of three methods: (a) analysis of comparable sales, (b) original and replacement costs, and (c) capitalization of income. An appropriative water right is usufructuary, that is, a right to the use only. (*San Bernardino etc. Water Dist.* v. *Meeks & Daley Water Co.,* 226 Cal. App.2d 216, 221 [38 Cal.Rptr. 51].) For valuation purposes, it bears analogies to the possessory interest of the lessee of tax-exempt land, which also has a usufructuary character. (*Hammond Lumber Co.* v. *County of Los Angeles,* 104 Cal. App. 235, 240 [285 P. 896].) The capitalization of income method has been regarded as particularly suitable for the valuation of both kinds of interests. (*DeLuz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546; *County of Tuolumne* v. *State Board of Equalization, supra,* 206 Cal.App. 2d at pp. 366-367; *Alpaugh Irr. Dist.* v. *County of Kern,* 113 Cal.App.2d 286, 293-294 [248 P.2d 117].) The leading case, *DeLuz Homes,* describes the general method as follows (45 Cal.2d at pp. 564-565): "According to this method, the value of property is the sum of anticipated future installments of net income from the property, less an allowance for interest and the risk of partial or no receipt. (See American Institute of Real Estate Appraisers, The Appraisal of Real Estate, chs. 17, 18; Babcock, The Valuation of Real Estate, pp. 39, 127-129; 1 Bonbright, The Valuation of Property, ch. XI.) '[I]t involves a capitalization or discounted valuation of the realized or prospective net monetary income derivable by continuous exploitation rather than by resale.' (1 Bonbright, op. cit. *supra,* p. 230.) This first step in the process is to determine prospective net income and this is done by estimating future gross income and deducting therefrom expected necessary expenses incident to maintenance and operation of the property. In instances in which future income cannot be estimated with reasonable accuracy or is not ascribable

entirely to the property, prospective net monetary income is imputed in an amount equal to a minimum reasonable return on estimated market value. (See *Kaiser Co. v. Reid,* 30 Cal.2d 610, 623 [184 P.2d 879].) Since it is generally accepted that a person who agrees to receive payment in the future is entitled to interest both for waiting and the risk of partial or no receipt, the second step is to discount each future installment of income by a rate of interest that takes into account the hazards of the investment and the accepted concepts of a 'fair return.' The sum of the discounted installments is the present value of the property. . . .''

In assessing a multipurpose water project under article XIII, section 1, a number of special problems arise. An appropriative water right is theoretically eternal, differing from a leasehold in this respect. It has been pointed out that in capitalizing the net income from a nonwasting asset, income is not discounted but simply divided by the appropriate capitalization rate. (Cal. State Board of Equalization, Assessors' Handbook, General Appraisal Manual (1962 Rev.) pp. 501-502.) Prospective net income is frequently attributable to a combination of exempt and taxable assets. Here, for example, income is produced by exempt physical structures, exempt water rights and taxable water rights. Such a combination of elements may call for capitalizing imputed rather than actual net income. (*County of Riverside v. Palm-Ramon Development Co.,* 63 Cal.2d 534, 538-539 [47 Cal.Rptr. 377, 407 P.2d 289]; *DeLuz Homes, Inc. v. County of San Diego, supra,* 45 Cal.2d at pp. 565, 572; see 1 Bonbright, Valuation of Property, pp. 493-494.) Where the project is an income-producing segment of an integrated operation extending over a number of counties, income attributed to taxable assets within the county may be estimated or may be calculated by the ''unit rule'' evolved for assessment of privately owned utilities. (*County of Tuolumne v. State Board of Equalization, supra,* 206 Cal.App. 2d at p. 367.) Such special difficulties are superimposed upon other variants attending the capitalization of income method. As Justice Stone noted in the *Tuolumne* case (206 Cal.App. 2d at p. 366) : ''Placing a value on the usufructuary right to divert water separate and apart from the structures which are necessary to divert it, presents a knotty problem which does not admit to an entirely satisfactory solution.''

In the present cases the state board's valuation

"findings" consist of the single terse statement that the assessments are "reduced" to $275,000 and $300,000, respectively. We are confronted with the task of reviewing an extremely complex and difficult valuation process by grasping the short horns of this curt finding. It is too general to permit judicial review. It fails to disclose the board's quantitative or qualitative concept of the water right it was valuing; its method of calculating the market value of this right; on the assumption that it applied the capitalized income approach, its method of allocating net income to the taxable income-producing asset within the taxing jurisdictions; the amount of net income so allocated; the capitalization rate applied to that income; its finding of market value; the ratio of assessed-to-market value it applied; whether, even, if the board engaged in any kind of reasoned analysis. All these matters are left to surmise, inference, requests for judicial notice and attempted supplementation by documentary evidence and the transcript of the administrative hearing. We do not imply that a specific finding of each element is the *sine qua non* of an adequate decision. Rather, the accumulation of omissions forecloses the injured parties from judicial attack and the court from judicial review.

As a practical matter, omissions in findings may sometimes be filled by such relevant references as are available. (*Swars* v. *Council of City of Vallejo, supra,* 33 Cal.2d at pp. 872-873.) The Attorney General has requested us to take judicial notice of the ratios of assessed-to-market value prevailing in the various counties as published by the board on September 2, 1961, under Revenue and Taxation Code section 1819. (See *infra.*) Applying these ratios in reverse, the Attorney General's brief presents the following *inferred* findings of market value:

| | Amador County | Calaveras County |
|---|---|---|
| Assessed value | $ 275,000 | $ 300,000 |
| Ratio | ÷ .172 | ÷ .188 |
| Inferred full cash (market) value .. | 1,598,837 | 1,595,744 |
| Rounded | 1,600,000 | 1,600,000 |

| | |
|---|---|
| Add | $1,600,000 |
| | 1,600,000 |
| Total | $3,200,000 |

The counties' brief on appeal acknowledges that the board apparently found a market value of $3,200,000 for the taxable water rights, allocated one-half this market value to each of the two counties, then applied an assessed-to-market value ratio of 17.2 percent to establish the Amador assessment and 18.8 percent for Calaveras. The brief of East Bay, as real party in interest, does not dispute the calculation. Under the circumstances we can comfortably accept the Attorney General's amplification of the board's decision. This amplification uncovers only the board's finding of market value. Judicial review, as we have noted, extends to the method of valuation as well. (*County of Riverside* v. *Palm-Ramon Development Co., supra,* 63 Cal.2d at p. 538; *DeLuz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d at p. 564.) An unrevealed method of valuation eludes attack and defense by the parties and frustrates review by the courts. There is nothing in the board's decision or in the evidence before it to demonstrate what method of valuation it adopted. Judicial inability to test the method prevents a test of the assessment itself.

Assessment equalization boards are seldom called upon to explain their decisions. (See Carr, *Property Assessments— Protest, Appeal and Judicial Review,* 39 State Bar J. 877, 883.) As a practical matter, the unfolding of the administrative process preceding tax litigation usually supplies enough explanatory material to fulfill the needs of judicial review. An action for the collection or refund of local property taxes usually takes place after the local board has denied an equalization petition, in effect adopting the valuation reached by the tax assessor. The latter's assessment method is revealed by his transcribed testimony before the local board or by his testimony in the trial court. In the most recent reported decision, *Apple Valley Ranchos Water Co.* v. *County of San Bernardino,* 63 Cal.2d 870 [48 Cal.Rptr. 627, 409 P.2d 707] (filed Jan. 25, 1966), the local board had entered extensive findings (including a description of its valuation method) in its minutes. Any of these procedural devices supplies the reviewing court with an authoritative statement of the assessment, the market valuation and the method employed to reach it. The court may then measure the assessment method by appropriate standards, confirming it as in the *Apple Valley Ranchos* and *Palm-Ramon* cases,

*supra,* or rejecting it, as in the *DeLuz* case. Thus there has been little occasion for the judicial delineation of standards for administrative decision in tax valuation cases.

In theory article XIII, section 1, empowers the State Board of Equalization to review assessments originally reached by the county assessor. But the Constitution also authorizes the board to "adjust" the assessment. In adjusting the county assessor's valuation by substituting its own, the board effectually makes a new assessment and itself becomes the assessor. The determination is subject to judicial review at the behest of the taxing agency as well as the taxpayer. (See *People* v. *County of Tulare,* 45 Cal.2d 317, 319-320 [289 P.2d 11]; *County of Tuolumne* v. *State Board of Equalization, supra,* 206 Cal.App.2d at pp. 373-374.)

 Judicial review of assessments and assessment practices is impossible and purported review of specific valuations is meaningless when assessing agencies' valuation methods are obscured by unexplained decisions. However limited judicial scrutiny of the assessment itself, even that partial inquiry is blocked when the valuation method is unrevealed. The Supreme Court remarked in *Universal Consol. Oil Co.* v. *Byram,* 25 Cal.2d 353, 361 [153 P.2d 746]: "The *concluding steps* of the equalization proceeding are many times the most essential to the preservation of the taxpayer's rights." They are equally essential to the preservation of the taxing agencies' powers.

The courts have reviewed a number of assessment decisions of the State Board of Equalization reached under article XIII, section 1. In those cases where valuation was in issue, the state board had adopted or confirmed the action of the local assessor. The latter had described the assessment, the market valuation and the method in the course of the transcribed administrative hearing. (*City of Los Angeles* v. *County of Mono, supra,* 51 Cal.2d at pp. 851-852; *City of Pasadena* v. *County of Los Angeles,* 37 Cal.2d 129 [230 P.2d 801]; *County of Tuolumne* v. *State Board of Equalization, supra,* 206 Cal.App.2d at pp. 365-368; *Alpaugh Irr. Dist.* v. *County of Kern, supra,* 113 Cal.App.2d at pp. 293-294.) The absence of formal findings in those cases did not prevent or impede judicial review because the assessor's description of his valuation method supplied an acceptable (if unacknowledged) substitute. Here the state board has rejected the

counties' valuation and adopted its own without revealing the basis for its action and without an acceptable, authoritative substitute for that revelation.

In the *Tuolumne* case, *supra*, the exempt and taxable rights were located at five physically separate diversion points, each of which had been separately assessed. The state board reduced the four exempt assessments to zero and adopted the assessor's valuation of the fifth. Since Tuolumne County's valuation approach had been described in the administrative hearing, the court had no occasion to seek that approach within the four corners of the board's written decision. Here, in contrast, the board was presented with a single unsegregated assessment covering commingled exempt and taxable interests. The board excised the former and placed its own valuation on the latter. In the absence of some authoritative statement of the valuation method adopted by the board, the court cannot ascertain whether its method was legally acceptable or arbitrary.

Mr. Henning, who had been employed by the counties and testified before the board, described the valuation method employed in reaching the counties' original unsegregated assessment. Additionally, during the hearing he made a separate evaluation of the downstream rights. The Board of Equalization rejected both the original and the segregated assessment figures posited by Mr. Henning. Hence his evaluation approach can hardly be viewed as that of the board. Other witnesses, notably Mr. Parle for the board and Mr. John D. Russell for the utility district, supplied market value appraisals for the entire group of water rights, but did not offer a segregated valuation of the rights acquired by condemnation. It is impossible to say that the valuation method described by any of the witnesses was that adopted by the board.

It is true of course that the counties have the burden of demonstrating that the state board acted arbitrarily. (*City of Los Angeles* v. *County of Mono, supra,* 51 Cal.2d at p. 851.) In support of the board's decision the Attorney General's brief hypothesizes six different calculations, designed to demonstrate that the taxable rights could have a market value ranging between $1,992,000 and $4,224,000. The range is produced by substituting varying capitalization rates, water prices and plant costs in place of those used by the valuation witnesses, then applying a 22 percent factor

derived from comparing Mokelumne River run-off in four sample years with total water storage at Pardee Dam. There is no hint *in the record* that any of these represents the valuation method adopted by the board. To all appearances, they represent *post hoc* justifications to support a preexisting result. Indeed, they demonstrate what wide variations can be procured by shifting a single percentage point in the capitalization rate, indicating the vital role played by whatever rate the board may have used. The point is not that the board acted arbitrarily, but that the lack of any statement of its method effectually frustrates attempts to discern arbitrary action.

 The board's failure to make adequate findings leaves the valuation proceeding under article XIII, section 1, in an incomplete stage. Thus the matter should be remanded to the board for further proceedings. (*Universal Consol. Oil Co.* v. *Byram, supra,* 25 Cal.2d at p. 363; see also *DeLuz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d at p. 574.) Since application of the "intercounty equalization ratios" to the board's market valuation would remain a source of controversy, we state our views on that subject.

Sections 1815 to 1825 of the Revenue and Taxation Code require the State Board of Equalization to make periodic surveys and to prepare annual tabulations showing the ratio of assessed to cash (market) value of locally assessed property in each county. Under section 1819, the tabulations must be published not later than August 23 (formerly not later than September 2) of each year. Section 1815 declares that the board's surveys have the purpose of enabling it to perform its duties "under this article" and under article XIII, section 9 (directing intercounty equalization of tax valuations) and under article XIII, section 14 (providing for the state board's assessment of privately owned public utilities).

Acting under these statutes, the Board of Equalization on September 2, 1961, published statewide tabulations indicating that Amador County was assessing property at 17.2 percent of market value and Calaveras at 18.8 percent of market value. As we know, these ratios were applied by the board in assessing East Bay's downstream water rights. The counties contend that neither article XIII, section 1, nor any statute authorized the board to apply these assessment ratios. They point out that application of these intercounty ratios permits

East Bay Utility District and similar bodies to seek assessments not available to owners of other locally assessed property, who cannot go to the state board for adjustment of individual assessments.

Without regard to the identity of the assessing agency, article XIII, section 1, of the Constitution requires that all property be taxed in proportion to its value. The constitutional goals are equality and uniformity. (*Watchtower Bible & Tract Soc.* v. *County of Los Angeles,* 30 Cal.2d 426, 429 [182 P.2d 178]; *County of San Bernardino* v. *Way,* 18 Cal.2d 647, 657 [117 P.2d 354].) In authorizing the State Board of Equalization to review assessments of taxable, publicly owned assets, the constitutional provision implies that the board is not to disregard assessment practices in the particular locality; while its power of adjustment would indicate that the board may supersede the local assessment, utilizing its own method of achieving equality and uniformity. (*County of Tuolumne* v. *State Board of Equalization, supra,* 206 Cal.App.2d at pp. 368, 372.) Publicly owned utilities' privilege of seeking reassessment at the hands of the state board could conceivably create lack of uniformity in relation to other owners of locally assessed property. The same privilege, however, contributes to uniformity between these utilities and privately owned utilities which the state board assesses under article XIII, section 14, of the state Constitution. Article XIII, section 1, does not require the state board to adopt and apply local assessment practices in assessing public agencies, but only to seek uniformity and equality.

Counsel for the counties do not suggest any ratio more appropriate than that used by the board, nor do they demonstrate that the board's ratios would produce a dollar result any different than the counties'. At the hearing before the board Calaveras County's assessor testified that he utilized a 25 percent assessment ratio. Amador County's assessor did not describe his ratio. Neither was asked whether his level of market value appraisals coincided with the state board's. Given different levels of market value appraisals, a ratio of 17.2 percent or 18.8 percent could produce the same result as a 25 percent ratio. As commanded by statute, the board had ascertained that, in terms of its own appraisals, the former ratios were those actually prevailing in the two counties. In the absence of demonstrated error in establishing

these ratios, their use would produce uniformity with the assessment levels established by the county assessor.

Further, the statutes dealing with intercounty equalization ratios inferentially authorize their application here. Section 1815 directs the board to make its surveys to enable it to perform its duties "under this article." Included in the same article of the Revenue and Taxation Code are sections 1822 and 1822.5, which deal with the board's function of hearing applications for reassessment of publicly owned property under article XIII, section 1. Indeed, section 1822 requires petitions for reassessment to be filed with the state board shortly after completion of the local assessment roll but before the board's deadline on publication of intercounty ratios.[3] As we construe the constitutional provision and these statutes, the state board is authorized but not compelled to apply intercounty equalization ratios.

The judgments are reversed with directions to the trial court to remand these matters to the State Board of Equalization for further consideration and action, including but not limited to the rendition of findings.

Pierce, P. J., concurred.

REGAN, J.—Although I concur with the majority decision that this case must be sent back to the board for more definitive findings on its methods of evaluation, I dissent with the majority conclusion that the district acquired its water rights by direct appropriation of unappropriated water in the Mokelumne River pursuant to permits issued by the state and for that reason is exempt from taxation. It is my opinion that these water rights were not exempt, that the district's

---

[3]Section 1822 provides:

"If any county, city and county, or municipal corporation desires to secure a review, equalization, or adjustment of the assessment of its property by the board in pursuance of Section 1 of Article XIII of the State Constitution, it shall apply to the board therefor in writing on or before the third Monday in July, or within two weeks after the completion and delivery by the assessor of the local roll containing such assessment to the clerk of the board of supervisors as provided in Section 617, whichever is the later. The application shall show the facts claimed to require action of the board, and a copy thereof shall be filed with the assessor whose assessment is questioned.

"Upon receipt of a timely application the board shall afford the applicant notice and a hearing in accordance with such rules and regulations as the board may prescribe."

water rights fall within the exemption of article XIII, section 1 of the California Constitution.

The East Bay District was organized in 1923 and adopted its Mokelumne River Project in September 1924.

Pursuant to the California Water Commission Act (now Wat. Code, § 1000 et seq.), the district filed, in 1924, an application for a permit to appropriate unappropriated water on the Mokelumne. In subsequent years 1925 and 1926 applications were filed for the diversion of water for the development of hydroelectric power.

At the time of the hearing in 1925 on the district's first application by the Division of Water Rights Department, there were 22 applications, falling by reason of ownership into three distinct groups: The East Bay District, the J. W. Preston group, and Stephen E. Kieffer.

The Preston projects were initiated when it filed applications in 1919 and 1920 to divert water for irrigation purposes. The Kieffer project was initiated by filing applications in 1921 and 1923 to divert water for agricultural purposes, and for a municipal water supply for cities in Sacramento, San Joaquin Valley and San Francisco Bay. The East Bay District project was initiated by the filing of its application in 1924 for the main purpose of delivering municipal water supplies to the cities on the east side of San Francisco Bay.

The Division of Water Rights Department in its decision of 1926 noted that both Preston and Kieffer had filed their applications prior to the district. However, recognizing the mandate of section 20 of the Water Act (now Wat. Code, § 1460), which provides that the application for a permit by a municipality for the use of water for the municipality or its inhabitants for domestic purposes shall be considered first in right irrespective of whether it is first in time, the Water Rights Department issued the permit to the district.

With this background in mind it is necessary to turn to article XIII, section 1, of the California Constitution.

Prior to its amendment in 1914, article XIII, section 1, exempted from taxation all property belonging to the state, or to any county or municipal corporation within the state. Because impending disaster, however, would result to smaller counties by the removal from the local tax rolls of lands and water rights acquired and to be utilized in connection with the acquisition or extension of municipal water supplies such as were then in progress by the City and County of San Francisco and the City of Los Angeles, the amendment in

1914 was adopted. (*City & County of San Francisco* v. *County of Alameda*, 5 Cal.2d 243, 246 [54 P.2d 462]; *Rock Creek Water Dist.* v. *County of Calaveras*, 29 Cal.2d 7 [172 P.2d 863].) As amended this section exempts from taxation property belonging to the state or to any county, city and county or municipal corporation within the state; *but from the operation of this exemption there is excepted "such lands and the improvements thereon located outside of the county, city and county or municipal corporation owning the same as were subject to taxation at the time of the acquisition of the same by said county, city and county or municipal corporation; . . ."* [Italics added.]

The fundamental question here is whether the water rights acquired by the district were "subject to taxation at the time of the acquisition."

When Kieffer and the Preston group filed their applications to appropriate water, they secured a conditional right to the use of water. (*Eaton* v. *State Water Rights Board*, 171 Cal.App.2d 409, 415 [340 P.2d 722]; Wat. Code, § 1450.) This right is an inchoate right, an incomplete right subject to defeasance, but it is a possessory interest in real property. (*Madera Irr. Dist.* v. *All Persons*, 47 Cal.2d 681, 689-691 [306 P.2d 886]; *Yuba River Power Co.* v. *Nevada Irr. Dist.*, 207 Cal. 521, 527 [279 P. 128]; *Silver Lake etc. Co.* v. *City of Los Angeles*, 176 Cal. 96, 101 [167 P. 697].) As such the water rights which emanated from these filings are land in the sense that the word "land" is used in article XIII, section 1, and is assessable as such. (*County of Tuolumne* v. *State Board of Equalization*, 206 Cal.App.2d 352, 364 [24 Cal.Rptr. 113]; *Alpaugh Irr. Dist.* v. *County of Kern*, 113 Cal.App.2d 286, 293 [248 P.2d 117]; *Waterford Irr. Dist.* v. *County of Stanislaus*, 102 Cal.App.2d 839 [228 P.2d 341].) It would be immaterial whether these appropriate filings were in fact taxed when acquired. (*County of Tuolumne* v. *State Board of Equalization, supra.*) Nor, in my opinion, would it be material whether the district acquired these water rights through Kieffer and the Preston group as transferee or because it was accorded a preferred priority pursuant to Water Code section 1460 (then section 20 of the Water Act).

To hold exempt from taxation a municipality that acquires its water rights because of its preferred priority which is granted it by legislative enactment is to hold that a statute takes precedence over the constitutional mandate of article

XIII, section 1, which excepts from tax exemption such lands located outside the municipal corporation owning the same as were subject to taxation at the time of the acquisition by said municipal corporation.

I cannot believe the Legislature so intended.

The petitions of the appellants and the defendants and respondents for a hearing by the Supreme Court was denied April 27, 1966. Traynor, C. J., and Burke, J., were of the opinion that the petition should be granted.