## CHICAGO & EASTERN ILLINOIS RAILROAD CO.
### ET AL. *v.* UNITED STATES ET AL.

No. 275. Decided December 2, 1963.

*Richard M. Freeman* and *F. F. Vesper* for appellants.

*Solicitor General Cox, Assistant Attorney General Orrick, Lionel Kestenbaum, Elliott H. Moyer, Robert W. Ginnane* and *Stanton P. Sender* for the United States and the Interstate Commerce Commission.

*Richard J. Murphy, John W. Hanifin* and *Robert H. Bierma* for rail carrier appellees.

PER CURIAM.

The motion to add the Baltimore and Ohio Railroad Company et al., as parties appellee, is granted. The motions to affirm are granted and the judgment is affirmed.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS concurs, dissenting.

In the Transportation Act of 1940 Congress amended the Interstate Commerce Act to authorize the Interstate Commerce Commission to regulate rates of interstate water carriers as well as of railroads and motor carriers. 54

Stat. 929, 49 U. S. C. § 901 *et seq.* At the time the Act was passed there was active opposition in Congress from those who feared that the Commission in exercising the power granted it would be too "railroad-minded." 84 Cong. Rec. 5965; see also *id.,* at 5880–5883. For this reason, as was pointed out in *Interstate Commerce Comm'n* v. *Mechling,* 330 U. S. 567, 574–577, and *Interstate Commerce Comm'n* v. *Inland Waterways Corp.,* 319 U. S. 671, 692 (dissenting opinion), the draftsmen of the legislation specifically wrote into the Act the "National Transportation Policy," 54 Stat. 899, 49 U. S. C. preceding § 1, making explicit the command of Congress that there should be a "fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each." In the *Mechling* case, decided in 1947, and several times in recent years this Court and District Courts have had to protect inland barge lines from Commission action which would have frustrated the intent of Congress to secure for them the benefit of the inherent advantages of their low-cost mode of carriage. See generally *Arrow Transportation Co.* v. *Southern R. Co.,* 372 U. S. 658, 673 (dissenting opinion). Sometimes the Commission has used procedural delaying devices to deny barge lines their inherent advantage over railroads, see *Arrow Transportation Co.* v. *United States,* 176 F. Supp. 411 (D. C. N. D. Ala.), aff'd *sub nom. State Corporation Comm'n* v. *Arrow Transportation Co.,* 361 U. S. 353; [1] again, the Commission has taken away the

---

[1] ". . . [W]e would be remiss in our duty if we did not take note of the fact that for over eight years plaintiffs have been seeking relief in this proceeding from discriminatory rail rates which we find are in violation of the Interstate Commerce Act. Section 10 (e) of the Administrative Procedure Act provides that the reviewing court 'shall . . . compel agency action unlawfully withheld or unreasonably delayed.' It is the opinion of this court that the present case

152

inherent advantage of barge lines through "the device of a joint rate allowed carriers by rail but denied carriers by water," see *Dixie Carriers, Inc.,* v. *United States,* 351 U. S. 56, 59. Sometimes, as in the present case, the Commission has resorted to use of inadequate or obscure findings of fact. See, *e. g., Interstate Commerce Comm'n* v. *Mechling,* 330 U. S. 567; see also *Mechling Barge Lines, Inc.,* v. *United States,* 368 U. S. 324, 331 (dissenting opinion).[2] And barge lines have been denied the benefit of their inherent advantage when railroad rates challenged and later found to be unlawful have been permitted to take effect because of the long delay of the Commission in passing upon their unlawfulness.[3]

is an appropriate one for application of this statutory provision, and that the plaintiffs are entitled to prompt relief from the discriminatory rates presently in effect. The case is therefore remanded with instructions to the Commission to enter an order prescribing lawful, reasonable, and nondiscriminatory rates . . . ." 176 F. Supp., at 421.

[2] "The formula used here which lumps all through rail grain rates, irrespective of the services rendered, to give rail-carried grain a preferred rate over barge-carried grain, is indistinguishable in cause and consequence from an order which directly raises barge rates to relieve the railroads from barge competition. In any event, there has been no showing by the Commission as to how much, if any, of the 3-cent reshipping rate increase is attributable to the fact that ex-barge grain requires more terminal service on the average than does ex-rail grain." *Interstate Commerce Comm'n* v. *Mechling,* 330 U. S. 567, at 582.

[3] The unfolding of such an episode can be seen in the *Arrow* litigation, in which railroads proposed suddenly to cut their rates for all-rail grain shipments to the Southeast by more than half. Although the District Court subsequently found that the rates if approved probably would put the competing barge lines out of business in a short time, the Commission still had taken no action after seven months and so under the statute the rates went into effect. For a history of the *Arrow* litigation, see *Arrow Transportation Co.* v. *Southern R. Co.,* Civil No. 10,224 (D. C. N. D. Ala.), Aug. 3, 1962 (denying, for lack of jurisdiction, injunction of unlawful railroad rates); *Arrow Trans-*

Therefore it may be significant that the Commission in the present case, at the instance of the large Eastern railroads and without finding basic facts to support its conclusion, disallowed as noncompensatory a proposed joint rate of a small railroad and a barge line which would give shippers of coal from West Virginia and eastern Kentucky to Chicago the advantage of a rate appreciably less than that charged by the Eastern railroads for the same haul. 315 I. C. C. 129. In doing this the Commission denies the small railroad the right to ship coal for a division of $2.04 per ton in a barge-rail rate and leaves it with no alternative, if it wants this business, but to accept a division of $1.66 per ton for a substantially identical haul in combination with one of the large Eastern railroads. The obscure report of the Commission leaves an impression that its order may, in violation of the congressional will, have nullified an inherent advantage of the barge line and the cooperating railroad. It is true

portation Co. v. Southern R. Co., 83 Sup. Ct. 1 (in chambers) (extending order of circuit judges temporarily restraining rates); Arrow Transportation Co. v. Southern R. Co., 308 F. 2d 181 (C. A. 5th Cir.) (affirming District Court); Arrow Transportation Co. v. Southern R. Co., 83 Sup. Ct. 3 (in chambers) (restraining rates pending disposition of case by Supreme Court); Grain in Multiple-Car Shipments—River Crossings to the South, I. C. C. Division 2, 318 I. C. C. 641 (upholding unlawful rates in part); Arrow Transportation Co. v. Southern R. Co., 372 U. S. 658 (affirming Court of Appeals, thereby permitting rates to take effect). In short, Division 2 of the Commission waited 17 months before taking any action on the protest of the barge lines, thereby permitting rates to take effect which the District Court had said would destroy the barge lines. And it was nearly six months more before the full Commission on reconsideration held the rates unlawful. Grain in Multiple-Car Shipments— River Crossings to the South, I. &. S. Docket No. 7656, July 1, 1963, 321 I. C. C. 582. The same rates remain in effect today, for the railroads have obtained an order restraining the Commission's latest order. Cincinnati, N. O. & T. P. R. Co. v. United States, 220 F. Supp. 46 (D. C. S. D. Ohio).

that the Commission clearly found as an ultimate fact that the joint barge-rail rate was noncompensatory, and also set forth a series of figures which it said represented elements of cost and added them together to obtain a figure 5.6 cents per ton higher than the proposed rate. I have checked the Commission's addition, and find it correct. But when I turn to what should be the basic findings of fact to support the accuracy of these figures, any illusory clarity in the Commission's report vanishes. I have examined the report with all the care of which I am capable in an effort to determine whether its ultimate conclusion is supported by substantial evidence. I am compelled to say that the Commission could have informed me just as well if it had written its so-called findings in ancient Sanskrit. I get no more enlightenment from the findings of fact and law of the District Court which left this Commission order standing on the legal assumption, plainly erroneous under decisions of this Court as I shall later point out, that the Commission's ultimate conclusion was enough, without the support of basic findings of fact. Nor have the labored and at times inconsistent efforts of government counsel and counsel for the Eastern railroads been successful in transforming the Commission's "findings" into meaningful English. Nevertheless, our Court approves both the action of the Commission and the ruling of the District Court without even permitting the proponents of the barge-rail rate to be heard in oral argument. While such summary treatment often is warranted,[4] I am constrained to say that in the present case it is so unjustified as to deny the right of direct appeal from the District Court which Congress authorized, see 28 U. S. C. § 1253, and which should never be treated lightly since it makes ours the only existing

---

[4] See Douglas, The Supreme Court and Its Case Load, 45 Cornell L. Q. 401.

court of review. I am sorry that the Court has not chosen to write an opinion to support its affirmance. I must admit for myself that I would find the task impossible and the attempt embarrassing.

Summary affirmance is particularly out of place here because the District Court proceeded on a clearly incorrect assumption of law, one contrary on its face to the command of Congress in the Administrative Procedure Act, and one which, in being approved here, apparently overrules a line of previous decisions of this Court. The District Court ruled that "the Commission is only required to set out ultimate and not evidentiary facts supporting its conclusions." With this contrast the requirement of § 8 (b) of the Administrative Procedure Act, 5 U. S. C. § 1007 (b), that "all decisions . . . shall . . . include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact . . . ." Contrast also statements by this Court that "findings based on the evidence must embrace the basic facts which are needed to sustain the order," *Morgan* v. *United States,* 298 U. S. 468, 480, and that "we have repeatedly emphasized the need for clarity and completeness in the basic or essential findings on which administrative orders rest." *Colorado-Wyoming Gas Co.* v. *Federal Power Comm'n,* 324 U. S. 626, 634. See also, *e. g., Atchison, T. & S. F. R. Co.* v. *United States,* 295 U. S. 193, 201–202; *Florida* v. *United States,* 282 U. S. 194, 215.

The insufficiency of the Commission's basic findings is made clearer by the facts and circumstances of this case. The Chicago and Eastern Illinois Railroad, appellant here, operates a line from the southern Indiana town of Mount Vernon, on the Ohio River, to the steel plants of the Chicago area. Most coal shipped to Chicago for steelmaking comes from the West Virginia area over the large Eastern railroads, intervening appellees, which, although authorized if not required by §§ 3 (4),

15 (3) and 15 (4) of the Interstate Commerce Act, 24 Stat. 380, 384, as amended, 49 U. S. C. §§ 3 (4), 15 (3), 15 (4), have refused to establish joint rates with any barge line. Some years ago the C&EI filed a tariff for hauling coal which came to Mount Vernon by barge. The Eastern roads protested. The Commission refused to approve a rate lower than $2.045 per ton, which it found to be the C&EI's 1957 cost. 308 I. C. C. 87; 310 I. C. C. 181. The C&EI then turned to the Ohio River Company, a barge line operating down the Ohio from the coal mines to Mount Vernon, and established with it a joint rate of $3.36, of which the railroad's share was to be $2.04. The joint rate saved paperwork and the expense of weighing coal transferred from the barges. The Eastern lines were charging $4.75 for the all-rail shipment.

The Eastern roads swiftly demanded that the ICC set aside the joint rate, claiming it was below cost and therefore illegal under § 1 (5) of the Interstate Commerce Act, 24 Stat. 379, as amended, 49 U. S. C. § 1 (5). Both the C&EI and the Eastern roads presented cost averages for each step of the operation. There were disputes on many factual points, and when the smoke had cleared the Commission emerged with its own set of figures, unlike that of either party, though the Commission did not make clear, and no one elsè in my judgment could tell, exactly why. In its opinion the Commission simply added up the figures it had mysteriously produced, found the sum to be $3.416, and held the rate proposed by the C&EI and the barge line to be illegal as 5.6 cents below cost. Review in the District Court produced some embarrassment, for both the Commission and the Eastern railroads filed briefs to demonstrate the crystal-clarity of the Commission's findings; however, their respective explanations of how the Commission had arrived at the figure it had were in part inconsistent.

One example should suffice to demonstrate the puzzling nature of the "findings" which the District Court upheld. Representatives of the C&EI testified that trains from Mount Vernon would, instead of being switched and weighed as they had been before the joint tariff, pass right through the switching yard without stopping except perhaps to change crews. The Eastern lines contended that the total costs should include the costs of weighing and switching, as before. The Commission finally made no charge for weighing, but charged for switching the cars just the same. Why the cars would be switched if they were not going to be weighed is not explained. No witness for either party had suggested such a thing. This switching charge alone accounts for 4.2 cents of the 5.6 cents on which the Commission relied to invalidate the tariff. The record reveals other disputes, resolved whether by analysis, inattention or whimsy no one can tell. The Commission's lawyers urged in the District Court that even if there was no way of justifying the 4.2 cents charge, it really didn't make any difference because that alone would not suffice to bring the total costs down to the level of the tariff. In fact, said the Commission, it "could have met all legal requirements by accepting *in toto* protestants' figures"; in effect, that the purpose of the hearing was not to determine what costs really were, but rather to produce a report setting forth figures to justify a conclusion. Heretofore I had thought that orders of administrative agencies were not to be sustained unless based on substantial evidence supported by the record. *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474. Yet how can this Court tell whether there was substantial evidence when it cannot tell how the Commission arrived at its figures? "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States* v. *Chicago,*

*M., St. P. & P. R. Co.*, 294 U. S. 499, 511. Explicit reasons for its result would seem all the more called for where the Commission under its earlier decisions had compelled those protesting a proposed initial rate like that in this case to bear the burden of proving the rate's invalidity. See, *e. g., Cotton from New Orleans*, 49 I. C. C. 751; *Bay State Milling Co. v. Great Lakes Transit Corp.*, 43 I. C. C. 338. The opinion of the Commission here means simply that the Commission strikes down the tariff, and reviewing courts will please trust that it had good reasons for doing so.

Furthermore, in *Interstate Commerce Comm'n v. Mechling*, 330 U. S. 567, 581–583, we held that use by the Commission of general formulas and unsifted averages could not take the place of findings. Yet the Commission here admits to basing much of its result on averages taken from the 1959 annual report of the C&EI on all its operations, leaving unanswered and unrebutted the protests of the C&EI that many costs which it incurs on other routes are not applicable to the Mount Vernon-Chicago run. In addition, the Commission increased costs taken from the annual report by 2.9% on the theory that operating expenses of the C&EI had increased by that amount during the year between the time of the report and the time of the hearing. This figure was stated to be the increase in costs of all railroads in the United States for the period. The C&EI protested that comparison of its 1957 and 1959 annual reports showed that many of its costs had been, contrary to any national average, decreasing slightly, and argued that there was no basis for the apparent conclusion that its costs had not continued to decrease, however much those of other railroads might have increased. But so fond was the Commission of its 2.9% "trending factor" that it seems to have included it as a part of the cost of the barge segment of the joint rate as well, without explaining how a supposed national increase in cost of labor and equipment for railroads is necessarily accompanied by one

for barge lines also. I am unable to grasp the logic which apparently determined that increases in costs of steel rails and maintenance of rolling stock made the Ohio River Company's barges more expensive to operate.

It appears that the Commission has ignored commands of Congress and of this Court. The large railroads have succeeded in this case in doing a great injury to a barge line and to a small railroad which dared willingly to cooperate with another mode of transport, as the law required it to do, in order to profit from the inherent advantages of each and thereby benefit the public. The Commission asks us to believe that the C&EI schemed to carry on an operation on which it would lose money, losing greater and greater sums the more coal it hauled, presumably in the hope of living on its capital until it had driven out of business such companies as the New York Central and the Pennsylvania. I find this a difficult proposition to accept, and should like to have the Commission explain in plain understandable English how it reached such a conclusion. Unfortunately, the report as it stands makes it impossible for me to say whether the ultimate findings are supported by substantial evidence or not. Yet instead of requiring the Commission to comply with the law at least sufficiently that its acts may be reviewed, my Brethren silently affirm a lower court judgment which I think is completely out of line with the mandate of Congress and our past emphatic holdings. The Commission apparently seeks to make a rubber stamp of any court reviewing its orders. I do not like that role. If summary disposition is in order, I should think reversal the appropriate judgment.