[Civ. No. 12230. Third Dist. Feb. 24, 1970.]

CALIFORNIA ASSOCIATION OF NURSING HOMES, SANITARIUMS, REST HOMES AND HOMES FOR THE AGED, INC., Plaintiff and Appellant, v. SPENCER W. WILLIAMS, as Administrator, etc., Defendant and Respondent.

## COUNSEL

Wilke, Fleury, Sapunor & Hoffelt and Richard H. Hoffelt for Plaintiff and Appellant.

Howard J. DeNike as Amicus Curiae on behalf of Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, and Walter J. Wiesner, Deputy Attorney General, for Defendant and Respondent.

## OPINION

**FRIEDMAN, J.**—At issue in this appeal is the validity of an administrative regulation prescribing the standards which determine the level of state payments for the care of Medi-Cal patients in nursing and convalescent homes.

Petitioner is an association of state-licensed nursing and convalescent homes. At the commencement of this action respondent Spencer Williams held the office then entitled Administrator of the Health and Welfare Agency, now called Secretary of the Human Relations Agency. The Director of Health Care Services is the official currently directing the Medi-Cal program.[1] Petitioner filed this declaratory relief and mandamus action in the

---

[1]Under a gubernatorial reorganization plan of 1968 the Administrator's title was altered to Secretary of the Human Relations Agency and direct administrative responsibility for the Medi-Cal program transferred to the Director of Health Care Services. The transfer was confirmed by statute the following year. (Stats. 1969, ch. 21.) The transfer of responsibility does not abate this action. (Gov. Code,

Sacramento Superior Court assailing validity of the regulation and contending that its financial provisions forced nursing homes to operate at a loss. After a hearing the court entered a judgment sustaining the regulation and declaring its validity. Petitioner appeals.

The basic features of the Medi-Cal program were described in some detail in *Morris* v. *Williams* (1967) 67 Cal.2d 733 [63 Cal.Rptr. 689, 433 P.2d 697]. Suffice it to say here that Title XIX of the Social Security Act (Public Law 89-97, 1965) authorized federal financial support to states which adopted conforming medical assistance programs. The California Legislature responded with the enactment of legislation establishing the Medi-Cal program. (Stats. 1965, Second Ex. Sess., ch. 4; Welf. & Inst. Code, div. 9, pt. 3, ch. 7.)[2] The new law became effective as an urgency measure on November 15, 1965, but expressly deferred operative date of the program until March 1, 1966.

As presently framed, the Medi-Cal legislation reposes administrative responsibility in the Director and Department of Health Care Services (§§ 14061-14062). It authorizes a variety of health care services for the needy, including nursing home services. (§ 14053.) One provision (§ 14104 as last amended by Stats. 1969, ch. 880) directs the department "to the extent feasible" to contract with carriers for the rendition of health services through health benefit plans. The same provision expresses a formula for establishing payment rates to the providers of health services.[3] Another provision (§ 14105, as last amended by Stats. 1969, ch. 1274) authorizes the Director to "limit the rates of payment for such services" and to adopt

§ 12080.7.) For convenience we shall refer to the currently responsible official, the Director of Health Care Services, as the respondent.

Press accounts indicate that Mr. Williams has resigned as Administrator of the Health and Welfare Agency and has been succeeded by Mr. Lucian Vandegrift; also, that Mr. Carel Mulder, the current Director of Health Care Services, is about to retire. No attempt has been made to substitute parties respondent. We are about to remand this action to the superior court. Appropriate substitutions should be made prior to issuance of a writ of mandate.

[2]Statutory references in this opinion will be to the Welfare and Institutions Code unless otherwise specified.

[3]At this point section 14104 states: "Payment for services to hospitals and other facilities and professional services shall be predicated on the basis of reimbursement for reasonable cost based on standards, determined by the director with the advice of the Health Review and Program Council. The formula for such payments shall be determined in accordance with regulations establishing the methods to be used and the items to be included. In prescribing such regulations, the department shall consider, among other things, the principles generally applied by state organizations representing such hospitals or other facilities or by established prepayment organizations which have developed such principles, in determining the method or methods to be used in arriving at the payment formula."

rules and regulations, including those which fix rates of payment for services not rendered under contract with carriers.[4]

Inasmuch as sections 14104 and 14105 call for regulations covering rates of payment for health services, the issues will be better viewed in the light of the Government Code provisions establishing procedures for the adoption of regulations. With inapplicable exceptions, regulations adopted by state agencies must be filed with the Secretary of State and published in the California Administrative Code. (Gov. Code, §§ 11380, 11409.) "Basic minimum procedural requirements" for the adoption or amendment of regulations call upon the agency to publish and mail notice of its proposed action, to provide interested persons an opportunity for hearing and to give consideration to all relevant matter presented to it. (Gov. Code, §§ 11420, 11423, 11424, 11425.) The demand for prior notice and hearing does not apply to the adoption of an emergency regulation which is accompanied by a statement of facts constituting the emergency; an emergency regulation, however, becomes ineffective at the end of 120 days unless within that time the agency certifies that it has provided notices and an opportunity for hearing. (Gov. Code, §§ 11421, 11422.1.) Regulations ordinarily become effective 30 days after filing, but an emergency regulation may be made effective immediately. (Gov. Code, § 11422.) Any interested person may petition a state agency requesting the adoption or repeal of a regulation. (Gov. Code, § 11426.) Any interested person may obtain a judicial declaration as to the validity of a regulation in a declaratory relief action; in addition to any other ground of invalidity, the judgment may declare the regulation invalid for substantial violation of the procedural statutes or, in the case of an emergency regulation, upon the ground that the facts in the accompanying statement do not constitute an emergency. (Gov. Code, § 11440.)

The challenged regulation is section 51511 of title 22, California Administrative Code. Since its original adoption in June 1966 it has been amended five times, the current regulation representing its sixth version. The original regulation and all later mutations were purportedly adopted as "emergency" regulations. For present purposes it will be adequate to set out in the margin

---

[4]Section 14105 states: "The director shall prescribe the policies to be followed in the administration of this chapter and the scope of the services to be provided, *and may limit the rates of payment for such services,* and shall adopt such rules and regulations as are necessary for carrying out, not inconsistent with, the provisions thereof.

"Such policies and regulations shall include rates for payment for services not rendered under a contract pursuant to Section 14104. Standards for costs shall be based on payments of the reasonable cost for such services." (The italicized clause was added by a 1967 amendment.)

the version in effect at the time this lawsuit was commenced, the amendment filed on June 8, 1967.[5]

Aside from the fixed ceiling on per diem payments, the challenged regulation does not on its face establish a standard for reimbursing nursing and convalescent homes. Rather, it incorporates by reference the contents of a statement or document entitled "State Schedule of Maximum Allowances, Section II, Part C, Long-Term Care Facilities." The Schedule of Maximum Allowances appears nowhere in the California Administrative Code. It takes the form of a pamphlet published by the State Department of Finance, bearing the issue date of February 1, 1967, but declaring an effective date of July 1, 1966. By fixing reimbursement in accordance with the Schedule of Maximum Allowances in effect at the time services are provided, regulation 51511 evidences a design to incorporate future changes in reimbursement standards adopted by the Department of Finance. Pending this appeal, the Department issued a new version of the Schedule of Maximum Allowances dated August 1, 1969.

In summary, the Schedule of Maximum Allowances issued by the Department of Finance declares its application to all medical care and rehabilitation programs operated by the state, with certain exceptions of no moment here. It provides for fixed levels of payment according to a schedule of specified rates or, alternatively, an individualized rate as shown by costs statements submitted by the particular nursing home. The individualized rate is determined by compounding two kinds of costs: *departmental,* i.e., primarily administrative and operating expenses, and *nondepartmental,* i.e., taxes, insurance and capital-related costs. Actual departmental costs are limited by three factors: (a) an assumed bed occupancy level of 90 percent, (b) administrative costs not exceeding 15 percent of operating costs, and (c) a scale of departmental cost ceilings, expressed in fixed dollar amounts and varying with the number of beds in the facility.[6] Nondepart-

---

[5]Title 22, section 51511, provided: "Effective July 1, 1966, reimbursement to nursing and convalescent homes shall be made in accordance with the State Schedule of Maximum Allowances, Section II, Part C, Long-Term Care Facilities which is in effect at the time medical assistance is provided.

"(a) The per diem rate paid under this section shall not exceed $12.74, excepting that the Administrator may negotiate all-inclusive per diem rates which provide for additional medically indicated covered service and provided that such negotiated rates do not increase overall program costs.

(b) A facility may continue until June 30, 1967, the per diem rate in effect during April, 1967, with the approval of the Administrator."

A later version of the regulation, filed as an "emergency" amendment on February 9, 1968, increased the daily rate ceiling from $12.74 to $14.

[6]In the Schedule of Maximum Allowances issued by the Department of Finance on February 1, 1967, the ceiling on departmental costs per "bed day" ranged from $10.28 for 43-bed or smaller facilities down to $9.05 for 127-bed or larger facilities. In a reissue of the Schedule of Maximum Allowances dated August 1, 1969, the

mental costs are fixed by an artificial formula roughly amounting to 18 percent of the facility's equalized assessed value (as shown on the county tax rolls) per bed per day.

The daily rate established by the rate schedule or the combination of the particular facility's departmental and nondepartmental costs as provided in the Schedule of Maximum Allowances is, in turn, subject to the $14 ceiling presently fixed by Regulation 51511 (fn. 5, *supra*).

Before bringing suit, petitioner resorted to the administrative remedy provided by Government Code section 11426, filing an administrative petition which alleged that Regulation 51511 resulted in per diem payments less than the nursing homes' reasonable cost per patient and requesting a public hearing and amendment of the regulation. An administrative hearing was held on October 20, 1967. At the hearing petitioner and another party presented oral testimony and an extensive set of documentary exhibits. The Health and Welfare Agency presented no evidence either to support its existing regulation or to rebut the showing of the complainants. It did not expressly reject the petition nor did it take action to amend the existing regulation. This suit was filed on January 23, 1968.[7]

In the trial court and in their original briefs on appeal, the parties raised three basic issues: (1) whether Regulation 51511 violates the statutory mandate requiring reimbursement for health services at rates based on reasonable costs; (2) whether, like public utilities, nursing and convalescent homes are constitutionally entitled to rates supplying a reasonable financial return on their investments; (3) whether, assuming invalidity of the administratively fixed reimbursement standard, the nursing and convalescent homes are entitled to reimbursement at a higher rate applied retroactively to March 1, 1966, the commencement of the Medi-Cal program.

Preliminary inquiry led this court to believe that the appeal might turn on sufficiency of the Medi-Cal agency's administrative procedures, that is, that the trial court might have erred in sustaining Regulation 51511 in the face of an administrative record which prevented meaningful judicial review. We requested and received supplemental briefs on this and allied questions.

---

ceilings range from $11.54 in small facilities down to $10.25 in larger facilities. As explained *infra,* these changes were not promulgated through publicly noticed hearings on the part of the Medi-Cal agency but were imposed by decisions made within the State Department of Finance without compliance with the Government Code's demands for public participation in the determinative process.

[7]Although the Health and Welfare Agency did not expressly reject the request for amendment, the Attorney General does not claim that petitioner failed to exhaust its administrative remedies. During the pendency of this action, Regulation 51511 was twice amended without recognizing petitioner's contentions. In effect, the administrative agency has rejected these contentions. (See *Hollon* v. *Pierce* (1967) 257 Cal.App.2d 468, 476 [64 Cal.Rptr. 808].)

We have concluded that the adoption and repeated amendment of the regulation are characterized by serious procedural vices which prevent meaningful judicial review and frustrate any attempt to pass upon its substantive compliance with the "reasonable cost" standard.

### Propriety of Regulation Adoption Procedure

California decisions on judicial review of administrative regulations reveal three kinds of inquiry: first, whether the agency has statutory authority to adopt a regulation of the kind under scrutiny; second, whether the action is arbitrary or entirely lacking in evidentiary support, third, whether the agency has complied with statutory procedures.[8] The agency's action comes before the court with a presumption of correctness and regularity, which places the burden of demonstrating invalidity upon the assailant.[9]

Petitioner's principal complaint has been the regulation's alleged violation of the statutory standard for reimbursement based upon the "reasonable cost" of the services. (§ § 14104, 14105, fns. 3, 4, *supra*.) Essentially, such a claim is one of arbitrariness, an entire lack of evidentiary support.[10] In this case the reviewing court has no means of evaluating the complaint because the agency has not compiled an identifiable body of evidence by which to measure the regulation's compliance with the statutory standard.

A statute calling for the adoption of administrative orders upon public notice and hearing implies that the evidence supporting the order be disclosed and made part of a hearing record with opportunity for refutation.[11] In *Rivera* v. *Division of Industrial Welfare, supra,* 265 Cal.App.2d

---

[8]*Morris* v. *Williams, supra,* 67 Cal.2d at pp. 748-749; *Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 832 [27 Cal.Rptr. 19, 377 P.2d 83]; *Rivera* v. *Division of Industrial Welfare* (1968) 265 Cal.App.2d 576, 594 [71 Cal.Rptr. 739].

[9]Evidence Code, section 664; *Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 175 [70 Cal.Rptr. 407, 444 P.2d 79]; *Rivera* v. *Division of Industrial Welfare, supra,* 265 Cal.App.2d at p. 594.

[10]"An action is arbitrary when it is based on no more than the will or desire of the decision-maker and not supported by a fair or substantial reason (*Bedford Inv. Co.* v. *Folb* (1947) 79 Cal.App.2d 363, 366 [180 P.2d 361]; *State* ex rel. *Cosmopolis Consol. School Dist.* v. *Bruno* (1963) 61 Wn.2d 461 [378 P.2d 691, 696]; see Jaffe, *Judicial Review: Question of Fact,* 69 Harv. L.Rev. 1020, 1021 (1956))." (*Clack* v. *State of California,* 275 Cal.App.2d 743, 747 [80 Cal.Rptr. 274].)

[11]*Morgan* v. *United States* (1937) 304 U.S. 1, 14-15, 18-19 [82 L.Ed. 1129, 1130-1131, 1132-1133, 58 S.Ct. 773]; *Morgan* v. *United States* (1936) 298 U.S. 468, 479-481 [80 L.Ed. 1288, 1294-1295, 56 S.Ct. 906]; *Interstate Commerce Com.* v. *Louisville & Nashville R.R. Co.* (1913) 227 U.S. 88, 91 [57 L.Ed. 431, 433, 33 S.Ct. 185]; *Olive Proration etc. Committee* v. *Agricultural etc. Com.* (1941) 17 Cal.2d 204, 210 [109 P.2d 918]; *Rivera* v. *Division of Industrial Welfare, supra,* 265 Cal.App.2d 576; *United Air Lines, Inc.* v. *Industrial Welfare Com.* (1963) 211 Cal.App.2d 729, 754 [28 Cal.Rptr. 238].

at page 588, this court observed that statutory demands "for noticed and recorded hearings are designed to insure fairness and inhibit arbitrariness through the instrumentalities of public participation in the investigative activity and a record paving the way for judicial review. Such assurances cannot be fulfilled by recorded hearings which are paralleled by substantial 'off-record' investigations."

■ Generally, an administrative agency, directed to fix rates or price levels after a hearing, may not base its decision upon evidence outside the record and not made available for rebuttal by the affected parties.[12] In part the demand is implied from statutes calling for public hearing as an assurance of fairness. In part it derives from the ineluctable need for an administrative record as the basis of effective judicial review.[13] In some cases effective review entails examination of the administrative findings in order to test the legal principles employed by the agency and to discern the sufficiency of the evidence.[14] In other cases the need is for the transcribed oral testimony and the documentary exhibits.[15]

As succinctly as possible, *United States* v. *Chicago M. St. P. & P. R.R. Co., supra,* 294 U.S. at page 511 [79 L.Ed. at p. 1032], states why an administrative record is the *sine qua non* of judicial review: "We must know what a decision means before the duty becomes ours to say whether it is right or wrong."

In promulgating the regulations directed by the Medi-Cal legislation, the administrator was bound by the Government Code provisions fixing "basic minimum procedural requirements" for the adoption and amendment of

---

[12]*Morgan* v. *United States, supra,* 298 U.S. at pp. 479-481 [80 L.Ed. at pp. 1294-1295]; *Olive Proration etc. Committee* v. *Agricultural etc. Com., supra,* 17 Cal.2d at p. 210; *Rivera* v. *Division of Industrial Welfare, supra,* 265 Cal.App.2d at pp. 588-589; see also cases cited 18 A.L.R.2d 552, 589, fns. 16-19, inclusive.

[13]In the review of administrative adjudications in California, Code of Civil Procedure, section 1094.5, expressly provides for transmission of the evidentiary record to the court. That statute does not govern judicial review of administrative rulemaking. (*Brock* v. *Superior Court* (1952) 109 Cal.App.2d 594, 598 [241 P.2d 283].) In the latter kind of review the demand for an administrative record is implied rather than expressed. As the writer of the *Brock* opinion pointed out (109 Cal.App.2d at p. 608): "How can an abuse of discretion be determined other than by an examination of the record on which the action was taken?"

[14]*United States* v. *Chicago M. St. P. & P. R.R. Co.* (1935) 294 U.S. 499, 504-505 [79 L.Ed. 1023, 1028-1029, 55 S.Ct. 462]; *California Motor Transport Co.* v. *Public Utilities Com.* (1963) 59 Cal.2d 270, 273-275 [28 Cal.Rptr. 868, 379 P.2d 324]; *County of Amador* v. *State Board of Equalization* (1966) 240 Cal.App.2d 205, 216 [49 Cal.Rptr. 448]; see *Chicago & Eastern Illinois R.R. Co.* v. *United States* (1963) 375 U.S. 150 [11 L.Ed.2d 217, 84 S.Ct. 224], separate opinion of Black, J.; 2 Davis, Administrative Law Treatise (1958) §§ 16.01, 16.05.

[15]*Ray* v. *Parker* (1940) 15 Cal.2d 275, 303-310 [101 P.2d 665]; *Brock* v. *Superior Court, supra,* 109 Cal.App.2d at pp. 602-608.

administrative regulations. (Gov. Code, § 11420.) Ordinarily, these call for published and mailed notices and a hearing at which any interested person may present statements, arguments or contentions; for the administration of an oath in the event oral testimony is taken; for the agency's consideration of all relevant matter presented to it. (Gov. Code, §§ 11423-11425.) These and the companion provision for judicial review (Gov. Code, § 11440) rest upon the assumption that a body of relevant evidentiary material will be compiled at the hearing, considered by the agency in formulating its order, preserved by it and transmitted to the court for the latter's use when and if review is sought. That assumption is unfulfilled here.

The record on appeal and the briefs of counsel point to no assemblage of evidence upon which the agency based its regulation. In the brief span of 30 months—from the regulation's original adoption in June 1966 through its fifth amendment in January 1969—the enacting agency invoked the emergency adoption procedure six times. Possibly these "emergencies" were viewed as occasion for dispensing with the establishment of a supporting evidentiary record.[16] On the assumption that the regulation's adoption and five later amendments were accompanied by hearings, the nature of these hearings remains unrevealed. Neither in the superior court nor on appeal has the Medi-Cal administrator declared whether such hearings were held; what, if anything, happened at these hearings; what, if any, evidence, was offered or accepted as the basis for its determination of "reasonable costs." The presumption of regularity cannot supply the lack of a hearing. (*Interstate Commerce Com.* v. *Louisville etc. R.R. Co., supra,* 227 U.S. at pp. 93-94 [57 L.Ed. at p. 434].)

In response to this court's specific inquiry, the Attorney General has conceded that the Medi-Cal administrator "did not create a formal administrative record containing the evidence upon which he relied in adopting the regulation." He argues, nevertheless, that there was substantial compliance with procedural demands, because petitioner and its members were party to

---

[16]The unbroken succession of "emergencies" suggests that some of the occasions were less exigent than others. Several of the descriptions of urgency are nothing more than statements of the motivation for the amendment. Concerning the genuineness of other emergencies there is little doubt. The wrinkles which frequently characterize new-born governmental programs were here magnified into chasms and mountains by inadequate legislative timetables and overlapping legislative mandates. The Medi-Cal legislation became effective November 15, 1965, with a direction that the program go into operation three and one-half months later, on March 1, 1966. In that narrow span the Administrator of the Health and Welfare Agency faced the monumental tasks of assembling an operating staff, coalescing treatment and healing facilities into a functioning statewide program, coordinating state and county activities, establishing treatment and financial standards and providing claims-receiving, review and disbursement machinery. The administrative convulsions accompanying the birth of the Medi-Cal program in 1965-1966 have been documented in the press and are a matter of common public knowledge.

rate negotiations with the agency's staff and had copies of federal and state publications, as well as reports of private hospital associations and similar groups, which played a role in these negotiations.

■ Administrative agencies have wide latitude in fashioning procedures and pursuing their methods of inquiry. (*Federal Communications Com. v. Pottsville Broadcasting Co.* (1940) 309 U.S. 134, 143 [84 L.Ed. 656, 662, 60 S. Ct. 437].) Procedural elasticity cannot be stretched into disregard of the law's public hearing demand. Private negotiations with selected members or representatives of an affected industry are no substitute for public hearings. There is a public interest in having the law obeyed. Directed by law to hold public hearings, government officials may not resort to invitational gatherings with selected members of an affected business. The participating firms and associations, however immediately affected, cannot waive the public's right of participation. Moreover, the assemblage of an amorphous mass of documents or reports utterly fails to identify the evidence which the Medi-Cal administrator considered and that which he did not. For all that appears here, he may have ignored the collection of documents and reports later placed in evidence in the trial court. In a curious inversion of roles, the assailant of the regulation, not its proponent, has presented the only evidence by which to measure its substantive validity. The administering agency has never revealed an evidentiary basis for its action. The claim of substantial compliance is untenable.[17]

The administrator's failure to assemble an evidentiary record is compounded by his attempt to incorporate by reference the publication of the State Department of Finance known as the Schedule of Maximum Allowances. The administrator asserts that his rate-fixing power includes authority to adopt the standards developed by the state fiscal agency. The assertion does not respond to statutory procedural demands for a public hearing at which evidence to support the proposed regulation is received, made available for rebuttal, weighed and considered by the law's designated agent and compiled in an identifiable record as the basis for judicial review. The Schedule of Maximum Allowances appears to be the result of ex parte studies by staff personnel of the Department of Finance. The Attorney General is frank in stating: "Insofar as the establishment of maximums [i.e., rate ceilings] are concerned, this was action taken by the Director of Finance." ■ To put the matter bluntly, Regulation 51511 is the product of the Department of Finance, not of the Medi-Cal agency. The latter's adoption of the former's fiat without independent consideration of the underlying evidence

---

[17]Neither party has discussed the provision of section 14104 (fn. 3, *supra*) which obliges the Director to determine rate standards with the advice of the Health Review and Program Council. The record reveals neither compliance nor violation of this obligation.

and without public or judicial access to it transgresses fundamental demands for the adoption of administrative regulations.[18]

Compliance with the public hearing demand precludes promulgation in the inner chambers of government offices, whether of the administering or fiscal agency. In *Olive Proration etc. Committee* v. *Agricultural etc. Com.,* *supra,* the agency completed its hearings and then, without notice to the parties, received and considered a field survey and report made by the Department of Finance. The court invalidated the procedure, declaring (17 Cal.2d at p. 210): "The parties were not apprised that this survey was being made or of the result of it until after the last order of the commission was promulgated. As a result they were denied all right of cross-examination with respect thereto and also of an opportunity to make a counter showing in rebuttal. Under such circumstances, the statutory requirement of a hearing was not met. [Citations.] Only evidence which the opposite party has an opportunity to refute at the hearing may be relied upon as the basis of a finding. [Citation.]"

■ There is no procedural barrier prohibiting the enacting agency from adopting by reference a set of standards issued by another agency if supporting evidence is made available at a public hearing, opportunity for refutation is given, the pro and con evidence considered and the evidentiary material assembled in an identifiable record. On the other hand, an attempt to embody by reference future modifications of the incorporated material without additional hearings would have dubious validity. (See *Olive Proration etc. Committee* v. *Agricultural etc. Com., supra,* 17 Cal.2d at p. 209.)

The state's appropriation for administrative expenses of the Medi-Cal program during the 1966-1967 fiscal year was accompanied by the following legislative declaration: ". . . provided, that any rule or regulation adopted

---

[18]At this point the comment of Chief Justice Hughes in *Morgan* v. *United States, supra,* 298 U.S. at page 481 [80 L.Ed. at p. 1295], is remarkably apropos: "There is thus no basis for the contention that the [statutory] authority . . . is given . . . so that one official may examine evidence, and another official who has not considered the evidence may make the findings and order. In such a view, it would be possible, for example, for one official to hear the evidence and argument and arrive at certain conclusions of fact, and another official who had not heard or considered either evidence or argument to overrule those conclusions and for reasons of policy to announce entirely different ones. It is no answer to say that the question for the court is whether the evidence supports the findings and the findings support the order. For the weight ascribed by the law to the findings—their conclusiveness when made within the sphere of the authority conferred—rests upon the assumption that the officer who makes the findings has addressed himself to the evidence and upon that evidence has conscientiously reached the conclusions which he deems it to justify. That duty cannot be performed by one who has not considered evidence or argument. It is not an impersonal obligation. It is a duty akin to that of a judge. The one who decides must hear."

by the Health and Welfare Agency Administrator during the 1966-67 fiscal year which adds to the cost of the medical assistance program shall only be effective from and after the date upon which it is approved as to availability of funds by the Department of Finance." (Stats. 1966, Second Ex. Sess., ch. 2, item 161.5.) A similar proviso has been attached to the annual appropriation for each of the subsequent fiscal years. (Stats. 1967, ch. 500, item 120; Stats. 1968, ch. 430, item 124; Stats. 1969, ch. 355, item 141.)

■ Contrary to the administrator's contention, these provisos do not authorize the Department of Finance to adopt supervening regulations establishing rates for health care services; nor do they permit the Director of Health Care Services to incorporate the promulgations of the Department of Finance without compliance with the public hearing process. The Medi-Cal legislation, in sections 14104 and 14105, enjoins the Director of Health Care Services, no one else, to adopt regulations establishing these rates. ■ In the enactment of these regulations he, no one else, is to receive and consider the evidence which will permit compliance with the statutory standard of "reasonable cost." The provisos attached to the annual appropriations empower the Department of Finance to defer the effective date of a rate-fixing regulation pushing current expenditures above available funds. Beyond authorizing postponement, they do not repose conflicting or overriding power in the fiscal agency.

Recognizing the procedural deficiencies which characterize the promulgation process, the petitioner nursing homes nevertheless maintain their claim that Regulation 51511 fails to meet the statutory standard of "reasonable cost." They call our attention to the set of 61 documentary exhibits which they—not the Medi-Cal agency—introduced at the administrative hearing held in response to their petition. The same 61 exhibits were introduced in the superior court by stipulation. The nursing homes urge us to measure the substantive validity of the regulation, including the Schedule of Maximum Allowances, against this assemblage of evidence.

That kind of action would overstep the judicial function by a wide margin. The function is quite restricted. ■ "As to the quasi-legislative acts of administrative agencies, 'judicial review is limited to an examination of the proceedings before the officer to determine whether his action has been arbitrary, capricious, or entirely lacking in evidentiary support, or whether he has failed to follow the procedure and give the notices required by law.' " (*Pitts* v. *Perluss, supra,* 58 Cal.2d at p. 833, quoting from *Brock* v. *Superior Court, supra,* 109 Cal.App.2d at p. 605; see also *Rivera* v. *Division of Industrial Welfare, supra,* 265 Cal.App.2d at p. 594.) ■ Without identification of the evidence forming the basis of the agency's action, a reviewing court can neither affirm nor deny the existence of evidentiary

support.[19] The court cannot invalidate the action by measuring evidence produced by its assailant, for it may differ from the evidence considered by the administrator. Without a record identifying the latter, the deficiency centers on the promulgation process, never reaching the alleged substantive violation.

 The failure of the Medi-Cal administrator to hold hearings establishing an evidentiary record underlying Regulation 51511 thwarts judicial review of the regulation's compliance with the "reasonable cost" standard and constitutes a substantial failure to comply with the procedural demands of the Administrative Procedure Act. It follows that the current regulation and its predecessors are invalid.[20] The administrator has as yet failed to comply with the statutory mandate to adopt a regulation establishing rates of payment for nursing home services. We next consider the effect of that failure.

### Retroactive Entitlement and Payment for Past Services

The nursing homes claim entitlement to a retroactive regulation establishing rates covering all services since the program's inception on March 1, 1966. One theory underlying this claim is constitutional. Petitioner points out that the advent of publicly financed medical care has impelled a huge increase in the number and capacity of proprietary nursing homes, simultaneously making them economically dependent on publicly assisted patients and on the state's business.[21] Charging economic compulsion, petitioner

---

[19]While the opportunity for de novo consideration at the judicial review stage may satisfy the needs of constitutional due process, it does not cure administrative noncompliance with statutes demanding public participation in the promulgation process. (See 1 Davis, Administrative Law Treatise (1958) § 7.10.) One court has observed: "This provision [for judicial review] did not obviate the necessity of a proper, legal hearing before the commission. It [the legislature] did not contemplate that the failure of the commission to hold a proper hearing should be corrected by appeal." (*L. A. Darling Co.* v. *Water Resources Com.* (1955) 341 Mich. 654, 665 [67 N.W.2d 890, 896].)

[20]Government Code, section 11440, a provision of the Administrative Procedure Act, declares: "Any interested person may obtain a judicial declaration as to the validity of any regulation by bringing an action for declaratory relief in the superior court in accordance with the provisions of the Code of Civil Procedure and in addition to any other ground which may exist, such regulation may be·declared to be invalid for a substantial failure to comply with the provisions of this chapter or, in the case of an emergency regulation or order of repeal, upon the ground that the facts recited in the statement do not constitute an emergency within the provisions of Section 11421(b)."

[21]See Report, Impact of Federal and State Medical Assistance Programs on Nursing Homes (State of California, Health and Welfare Agency, Office of Health Care Services (1967) pp. 2-3, 19-20.) The nursing homes call our attention to a stipulation between themselves and the Medi-Cal agency in a related superior court action, in which the parties stipulated to the existence of approximately 80,000 beds in licensed nursing homes in California. Of these, 8,000 were vacant. Of the 72,000

compares its members with public utilities, which are constitutionally entitled to service rates which are just and reasonable from an investor's standpoint. (See *Federal Power Com.* v. *Hope Natural Gas Co.* (1944) 320 U.S. 591, 603 [88 L.Ed. 333, 345, 64 S.Ct. 281].) Thus petitioner deduces a constitutional demand for a rate structure supplying both operating expenses and a reasonable return on invested capital. It protests the concept which, it claims, has colored the position of the Medi-Cal administrator, that of historic cost without any provision for retroactive adjustment to meet actual cost. It points out that the actual costs of private nursing home care (including a return on risk capital) vary widely. Petitioner contends that "reasonable cost" cannot be artificially pegged at a level below actual cost.

 The public utility analogy fails. Unlike public utilities, nursing homes are under no legal compulsion to serve all customers. If they are under economic pressure to accept state business, it is because they undertook the risks of a business burdened with that characteristic. Government is under no constitutional mandate to eliminate the economic perils involved in doing business with it. The Medi-Cal program seeks to subsidize needy patients, not to insulate suppliers from business risks. Here the state is not regulating the rate which the entrepreneur may charge his customers; rather, it is fixing the price it is willing to pay as one of the customers, albeit the largest. Legal compulsion to accept all state-supported patients might indeed evoke a "constitutional right." (See *United States* v. *New York Central R.R. Co.* (1929) 279 U.S. 73, 78 [73 L.Ed. 619, 620, 49 S.Ct. 260].) There is no such compulsion here. The law gives nursing homes liberty to price themselves out of the Medi-Cal market, as some (so the Attorney General informs us) have done.

An alternative theory for the claim of retroactive entitlement is contractual. A statute fixing government payments may amount to an offer which, when accepted by performance, culminates in a contract between the government and the offeree. (*County of San Luis Obispo* v. *Gage* (1903) 139 Cal. 398, 406-407 [73 P. 174].)

 Sections 14104 and 14105 (fns. 3 and 4, *supra*) do not express a statutory offer. They fix no scale of payment, but only a standard, i.e., reasonable cost, for an administrative regulation fixing a rate or rate formula. Despite the standard's verbal simplicity, its expression in a regulation involves " 'highly technical matters requiring the assistance of skilled and trained experts and economists and the gathering and study of large amounts

remaining beds, 65 percent were occupied by Medi-Cal patients, 25 percent by Medicare and 10 percent by private patients. The Director of Health Care Services does not gainsay these figures.

of statistical data and information.' " (*Pitts* v. *Perluss, supra,* 58 Cal.2d at p. 835.) To say that an increased rate is reasonable does not mean that the rate preceding it was unreasonable. The reasonable cost standard allows so many variables that administrative implementation is indispensable to the creation of financial claims in specific amounts. The statutes do not amount to an offer in the contractual sense.

■ Despite rejection of constitutional and contractual theories of entitlement, the nursing homes have a right to have the statute obeyed. The Medi-Cal legislation calls for a regulation establishing rates or a rate formula for nursing home care. Such a regulation does not now exist. The Director of Health Care Services is now obliged to adopt one. The nursing homes are entitled to a writ of mandate compelling him to perform this duty as one enjoined upon him by law. (*County of Los Angeles* v. *Riley* (1942) 20 Cal.2d 652, 662 [128 P.2d 537].)

At that point a very practical problem arises, that of establishing rates or a rate formula retroactively covering services back to the March 1, 1966, inception date. ■ The invalid orders of the past do not estop the Director after the remand or control him in reconsidering the entire problem in the light of all the information available to him. (*St. Joseph Stock Yards Co.* v. *United States* (1936) 298 U.S. 38, 63-64 [80 L.Ed. 1033, 1047-1048, 56 S.Ct. 720]; *Delta Air Lines, Inc.* v. *Civil Aeronautics Board* (1960) 280 F.2d 636, 639 [108 App.D.C. 88]; see 2 Davis, Administrative Law Treatise, § 18.08, pp. 598-599.) On review the courts may correct his error of law and on remand he is bound to enforce the legislative policy committed to his charge. (*Federal Communications Com.* v. *Pottsville Broadcasting Co., supra,* 309 U.S. at pp. 145-146 [84 L.Ed. at pp. 663-664].)

Aside from the one-time power to correct his invalid action, there is the question of the Director's standing authority to adopt regulations permitting retroactive redeterminations. That question is not directly posed here. In fashioning administrative solutions, the parties may find useful advice in the mail rate cases. The analogy seems more apt than the public utility decisions. In the mail rate cases, as here, the administrator fixes rates under statutory direction for a service purchased by the government as a customer. (See *Transcontinental & Western Air, Inc.* v. *Civil Aeronautics Board* (1949) 336 U.S. 601, 605-606 [93 L.Ed. 911, 915-916, 69 S.Ct. 756], also separate opinion of Jackson, J., at p. 608 [93 L.Ed. at p. 917]; *United States* v. *New York Central R.R. Co., supra,* 279 U.S. at p. 77 [73 L.Ed. at p. 620]; *Trans World Airlines, Inc.* v. *Civil Aeronautics Board* (D.C.Cir. 1967) 385 F.2d 648, 658; *American Overseas Airlines, Inc.* v. *Civil Aeronautics Board* (1958) 254 F.2d 744, 749-750 [103 App.D.C. 41];

cf. *Pacific Tel. & Tel. Co.* v. *Public Utilities Com.* (1965) 62 Cal.2d 634, 650-653 [44 Cal.Rptr. 1, 401 P.2d 353]; see also, 1 Davis, Administrative Law Treatise, § 7.08.)

Our attention has also been called to a memorandum opinion, dated December 8, 1969, by a three-judge federal court in the case of *Catholic Medical Center of Brooklyn & Queens, Inc.* v. *Rockefeller* (E.D. N.Y. 1969) 305 F.Supp. 1268. The opinion deals with a regulation of the federal Department of Health, Education and Welfare under Title XIX of the Social Security Act, requiring provision for retroactive adjustments in rates of hospital payment.

Petitioner seeks to have rates for past and future care measured by the reasonable cost yardstick, free or virtually free of fiscal restrictions. ■ The statutes, to the contrary, bespeak a legislative response not only to medical needs and the quality of medical care, but also to the promptings of fiscal economy. At least three separate sources express meaningful financial limitations. These financial limitations, springing from sources outside the Medi-Cal law itself, are entitled to concurrent operation with it. (See *Morris* v. *Willams, supra,* 67 Cal.2d at p. 752; *Warne* v. *Harkness* (1963) 60 Cal.2d 579, 588 [35 Cal.Rptr. 601, 387 P.2d 377].)

■ In the first place, all actions of the Medi-Cal administrator are limited by the annual appropriations for health services. (*Morris* v. *Williams, supra,* 67 Cal.2d at pp. 749-750.) Secondly, a 1967 amendment to section 14105 added a clause authorizing the director to "limit the rates of payment" for services. (See fn. 4, *supra.*) There is no need to decide here whether the 1967 amendment extracts any vital ingredient from the reasonable cost standard. Suffice it to say that it manifests a legislative intent to compromise reimbursement rates if necessitated by fiscal limitations. (*Morris* v. *Williams, supra,* 67 Cal.2d at pp. 757-758.)

■ The provisos attached to the annual Budget Act appropriations for the administrative expense of the Medi-Cal program form a third limitation. These provisos, as noted earlier, declare that "any rule or regulation adopted by the Director of the Department of Health Care Services during the [specified] fiscal year which adds to the cost of the medical assistance program shall only be effective from and after the date upon which it is approved as to availability of funds by the Department of Finance."

As we stated above, these provisos authorize the Department of Finance to demand deferment, but not to establish overriding or conflicting rates. Petitioner argues that this clause arms the Department of Finance with no power over nursing home rates, being attached to the appropriations for administrative costs, not the appropriations for health costs. To the contrary,

it evokes the fiscal agency's deferment authority as to any regulation increasing costs of the *program*. It is broader than a restriction on administrative expense. Health service cost (including nursing home care) is the prime ingredient of program cost.　▉　Hence a regulation allowing increased nursing home rates cannot be effective until the fiscal agency approves it from the standpoint of fund availability. The limitation extends equally to a regulation fixing current rates and one applicable to the past.

*Order*

The judgment is reversed and the cause remanded to the superior court with directions to issue a peremptory writ of mandate ordering the Director of Health Care Services to adopt a regulation or regulations establishing rates or rate formulae for the care of Medi-Cal patients in nursing and convalescent homes and, in the promulgation thereof, to give public notice and hold public hearings in compliance with the applicable provisions of the Administrative Procedure Act (Gov. Code, §§ 11371-11427, inclusive) and otherwise to conduct the proceedings consistently with the views expressed in this opinion.

Pierce, P. J., and Janes, J., concurred.

Petitions of both parties for rehearing were denied March 24, 1970, and the following opinion then rendered:

**THE COURT.**—Both parties have filed petitions for rehearing. The nursing homes contend that our opinion is not sufficiently explicit in calling for the adoption of regulations covering nursing home rates from March 1, 1966, the operative date of the Medi-Cal program.　▉　The Attorney General expresses his understanding that the writ of mandate will require the Medi-Cal agency to adopt regulations retroactively covering nursing home services rendered on and after March 1, 1966, but that the rates or rate formulae may vary for different periods. The Attorney General is correct.

▉　In his petition for rehearing, the Attorney General contends for the first time that the regulation in question fixes "rates, prices or tariffs," hence is within the exemption provided by Government Code section 11380, subdivision (a) (1).\* That section, a portion of the Administrative Procedure

---

\*Government Code section 11380 provides in part:
"Every state agency shall:
"(a) Transmit to the department for filing with the Secretary of State and with the Rules Committee of each house of the Legislature a certified copy of every regulation adopted by it except one which:
"(1) Establishes or fixes rates, prices or tariffs."

Act, exempts certain classes of regulations from the requirement of filing with the Secretary of State and from compliance with public notice and hearing procedures. (See Gov. Code, § 11421.) The contention amounts to a claim that the Medi-Cal agency may adopt rate regulations with no prior notice or hearing. It is at odds with past administrative practices of the Medi-Cal agency, which has habitually filed its regulations with the Secretary of State. These practices are consistent with the law; the claim of exemption is not.

 Usually, when a state law directs an agency to promulgate rates or tariffs binding on the public, the same law fixes its own procedure for hearings upon notice to the public. (See, e.g., Pub. Util. Code, § 1701 et seq.; Ins. Code, § 11734; *State Comp. Ins. Fund* v. *McConnell* (1956) 46 Cal.2d 330, 343 [294 P.2d 440]; cf. *Estate of Setzer* (1961) 192 Cal.App.2d 634, 639 [13 Cal.Rptr. 683].) In this case the Medi-Cal statutes evince a legislative intent to invoke the standard procedures of the Administrative Procedure Act. Thus section 14104 (fn. 3 of the opinion) calls for the adoption of regulations establishing "the methods to be used and the items to be included" in rate formulae. Section 14105 (fn. 4 of the opinion) calls for "rules and regulations" establishing policies, which shall include "rates for payment for services." Under both sections the scope of the agency's regulations is much broader than the Administrative Procedure Act's narrow exemption of rates, prices or tariffs. Although the Medi-Cal agency's regulations deal with rates or establish rate formulae, they are not within the dispensation provided in section 11380, subdivision (a) (1).

Appellant's petition for a hearing by the Supreme Court was denied April 29, 1970.